## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PAUL CHANDHOK,

      Plaintiff,

vs.                                             No. CIV 19-0362 JB/JFR

COMPANION LIFE INSURANCE
COMPANY,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Appeal from the Denial of Companion Life Under ERISA, filed January 3, 2020 (Doc. 21); and (ii) the Defendant's Motion for Summary Judgment, filed January 10, 2020 (Doc. 22)("Motion"). The Court held a hearing on January 30, 2020. See Clerk's Minutes at 1, filed January 30, 2020 (Doc. 26). The primary issue are: (i) whether Defendant Companion Life Insurance Company's conclusion that Plaintiff Paul Chandhok was not disabled before his diagnosis was arbitrary and capricious; (ii) whether Chandhok was insured beyond his last day of work; (iii) whether Companion Life's conclusion that Chandhok's disability ended on July 5, 2016, is arbitrary and capricious; and (iv) whether Companion Life's conclusion that Chandhok did not have a mental or nervous impairment is arbitrary and capricious. The Court concludes that: (i) Companion Life's conclusion that Chandhok was not injured before his diagnosis is arbitrary and capricious; (ii) the Policy insures Chandhok beyond his last day of work; (iii) Companion Life's conclusion that Chandhok's disability ended on July 5, 2016, is arbitrary and capricious; and (iv) Companion Life's conclusion that there is no support for Chandhok's mental or nervous impairment is arbitrary and capricious.

- 1 -

The Court, therefore, denies Companion Life's Motion.

**FACTUAL BACKGROUND**

Companion Life issued the Group Long Term Disability Policy ("Policy") to Melloy Brothers Enterprises, an Albuquerque, New Mexico-based car dealership. See Memorandum of Law in Support of Companion Insurance Company's Motion for Summary Judgment ¶ 1, at 2, filed January 10, 2020 (Doc. 22-1)("Memo.")(citing Group Long Term Disability Insurance Policy (undated), in the Administrative Record at 188-219, filed February 6, 2020 (Doc. 27)("A.R.")). The Policy covers "[a]ll Full-time Active Employees . . . . Full-time employment means the employee must work at least 30 hours per week." See Memo. ¶ 2, at 2 (citing Policy at 14, 23 (A.R. at 198, 207)). Chandhok was an Assistant Sales Manager at Melloy Brothers Enterprises, Inc., an Albuquerque, New Mexico-based car dealership. See Appellant's Brief in Chief at 5, filed January 3, 2020 (Doc. 21)("Brief"); Application for Group Life, AD&D (undated)(A.R. at 220); Notification of Appeal (Aug. 25, 2017)(A.R. at 1408). As part of his job, Chandhok first became insured under the Policy on June 1, 2015. See Memo. ¶ 3, at 2 (citing Application for Long Term Disability Income Benefits at 1 (dated June 23, 2016)(A.R. at 2742)("Application")). His last day of work at Melloy Brothers was March 4, 2016. See Memo. ¶ 4, at 2 (citing Application at 4 (A.R. at 2745)). Chandhok claimed disability on March 5, 2016. See Memo ¶ 4, at 2 (Application at 4 (A.R. at 2745)).

The Policy states that disability benefits are payable when the insureds: "'(1) become Disabled while insured under The Policy; (2) are Disabled through the Elimination Period; (3) remain Disabled beyond the Elimination Period; and (4) submit Proof of Loss to Us.'" Memo. ¶ 5, at 2-3 (quoting Policy at 27 (A.R. at 211)). One of the requirements of proving disability

under the Policy is that the insured is unable to perform "'one or more of the Essential Duties of

. . . Your Occupation for the 24 months following the Elimination period, and as a result Your

Current Monthly Earnings are less than 80% of Your indexed Pre-disability Earnings.'"  Memo.

¶ 6, at 3 (quoting Policy at 17 (A.R. at 201)).  To cover a disability, the Policy requires that the

disability result from "'accidental bodily injury,'" "'Sickness,'" "'Mental Illness,'" "'Substance

Abuse,'" or "'pregnancy.'"  Memo. ¶ 7, at 3 (quoting Policy at 17 (A.R. at 201)).  The Policy

terminates coverage on the earliest of

> the date The Policy terminates; the date The Policy no longer insures Your class;
> the date premium payment is due but not paid by the Employer; the last day of the
> period for which You make any required premium contribution; the last day of the
> month or on next following the month in which Your Employer terminates Your
> employment; the date You cease to be a Full-time Active Employee in an eligible
> class for any reason; unless coverage is extended under the Continuation
> Provisions.

Memo. ¶ 8, at 3-4 (quoting Policy at 25 (A.R. at 209)).  On June 24, 2015, months before

Chandhok's asserted injury, Dr. Michael Garcia, Chandhok's primary care physician, examined

Chandhok and found "'no particular injury but several months of medial left knee pain.'"  Brief at

10 (quoting Dr. Garcia Notes at 3 (dated June 24, 2015)(A.R. at 825)).

Chandhok says that he injured himself on January 9, 2016, when he caught his right heel

in a pothole and fell on his left knee.  See Memo. ¶ 9, at 4 (citing Application at 4 (A.R. at 2745);

First Medical Review Form at 2 (dated Sept. 15, 2016)(A.R. at 2553).  After this incident, he

experienced "'severe pain in left side of body (tip of toe), right heel spur & left knee bruised and

causing pain to lower back/leg/heel/spine."  Memo. ¶ 10, at 4 (citing Application at 3 (A.R. at

2744)).  Chandhok worked full time between his fall and March 4, 2016, and did not seek medical

attention until one week after he stopped working.  See Memo. ¶ 13, at 4 (citing Application at 4

(A.R. at 2745)).  Chandhok said on his application for disability benefits that, because seventy to

ninety percent of his job requires walking, his job is impossible to do with an injured knee and bruised heel.  See Memo. ¶ 11, at 4 (citing Application at 4 (A.R. at 2745)).  Chandhok has stated that his general manger saw him walking with a limp and suggested that he take time off work.  See Memo. ¶ 14, at 5 (citing First Letter from Sanda Kaserman to James Rawley at 3 (dated Aug. 25, 2017)(A.R. at 280)("First Letter")).  A manager at Melloy Brothers questioned the validity of Chandhok's disability claim.  See Memo. ¶ 14, at 5 (citing First Letter at 3 (A.R. at 280)); Marc Scully Notes at 1 (dated July 22, 2016)(A.R. at 187).

On March 10, 2016, Chandhok underwent a CT Scan after complaining about weakness and numbness in his extremities lasting three days.  See Memo. ¶ 15, at 5 (citing Notes from Lovelace Hospital at 15, 18 (dated July 27, 2017)(A.R. at 455, 458)).  The resulting preliminary radiological report noted that the results were unremarkable.  See Memo. ¶ 15, at 5 (citing Notes from Lovelace Hospital at 15 (A.R. at 455)).  The next day, on March 11, 2016, Chandhok went to an Emergency Room for numbness in his left arm, shoulder, and leg.  See Memo. ¶ 16, at 5 (citing Lovelace Hospital Treatment Notes at 1-5 (A.R. at 85-89)); Brief at 11.  He reported then that his symptoms started one week earlier and "'start randomly [and] go away randomly.'"  Memo. ¶ 17, at 5 (quoting Lovelace Hospital Treatment Notes at 3 (A.R. at 87))(alteration in Memo.).  The ER physician thought that Chandhok's symptoms were "'most likely neuropathy[1] that could be due to cervical root impingement or elbow impingement of the nerve by the way that

---

[1]Peripheral neuropathy is a result of nerve damage outside the brain and spinal cord and results in numbness and pain in extremities.  See "Peripheral Neuropathy," The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last accessed August 4, 2020).

that the patient describes,'" but "'a transient ischemic attack[2] is also in the differential,'" and he recommended an MRI.[3]  Memo. ¶ 18, at 5 (quoting Lovelace Hospital Treatment Notes at 4 (A.R. at 88)).  The ER records document Chandhok's hypertension history, but his blood pressure was normal on that day.  See Memo. ¶ 19, at 5 (citing Lovelace Hospital Treatment Notes at 4 (A.R. at 88)).  Chandhok rejected an MRI, because he is claustrophobic.  See Memo. ¶ 20, at 5 (citing Lovelace Hospital Treatment Notes at 1 (A.R. at 85)).  He also rejected overnight admission at the hospital.  See Memo. ¶ 21, at 5 (citing Lovelace Hospital Treatment Notes at 1, 5 (A.R. at 85, 89)).

Chandhok consulted with Dr. Floyd Pacheco, a podiatry specialist at New Mexico Orthopaedics, on March 15, 2016, for right foot pain.  See Memo. ¶ 22, at 6 (citing Dr. Pacheco Treatment Notes at 1-3 (dated August 19, 2016)(A.R. at 37-39); Lovelace Hospital Treatment Notes at 2 (A.R. at 86)); Brief at 12.  Chandhok told Dr. Pacheco that his symptoms started three weeks earlier but that he did not recall a specific injury causing his pain.  See Memo. ¶ 23, at 6 (citing Dr. Pacheco Treatment Notes at 1 (A.R. at 37)).  Chandhok described his pain as aching and severe, said his pain level was a nine out of ten, and said that his pain is worst when standing and walking.  See Brief at 12; Dr. Pacheco Treatment Notes at 1 (A.R. at 37).  Chandhok told Dr. Pacheco that he walks long hours at work.  See Brief at 12; Dr. Pacheco Treatment Notes at 1

---

[2]A transient ischemic attack is a "temporary period of symptoms similar to those of a stroke," which lasts only a few minutes and does not cause permanent damage.  "Transient Ischemic Attack," The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last accessed August 4, 2020).

[3]MRI stands for magnetic resonance imaging.  See "MRI," The Mayo Clinic, https://www.mayoclinic.org/tests-procedures/mri/about/pac-20384768 (last accessed August 4, 2020)("Mayo MRI").  Patients lie inside large, tube-shaped machines which uses a magnetic field to create the MRI images.  See Mayo MRI.  MRIs last up to an hour, as opposed to CT scans, which take only ten minutes.  See "MRI vs. CT Scan," Health Images, https://www.healthimages.com/mri-vs-ct-scan/ (last accessed August 4, 2020).

(A.R. at 37).  Dr. Pacheco diagnosed Chandhok with plantar fasciitis and injected his right tendon sheath with medication.  <u>See</u> Memo. ¶ 24, at 6 (citing Dr. Pacheco Treatment Notes at 2-3 (A.R. at 38-39)); Brief at 12.  Dr. Pacheco instructed Chandhok not to work for two weeks.  <u>See</u> Memo. ¶ 25, at 6 (citing Letter from Dr. Pacheco at 1 (dated March 15, 2016)(A.R. at 179)).

On March 18, 2016, Dr. Garcia examined Chandhok.  <u>See</u> Memo. ¶ 27, at 6 (citing March 18 Dr. Garcia Notes at 1-5 (dated March 18, 2016)(A.R. at 134-38)).  Dr. Garcia noted, among other results, "'[s]ensation both hands and feet intact to monofilament.  Pulses intact both wrists and feet.  No atrophy.'"  Memo. ¶ 29, at 6 (quoting March 18 Dr. Garcia Notes at 5 (A.R. at 138)). He also noted heel pain from a bone spur.  <u>See</u> Brief at 10; March 18 Dr. Garcia Notes at 1 (A.R. at 134).

Chandhok saw a neurologist on April 7, 2016.  <u>See</u> Memo. ¶ 33, at 7 (citing Dr. Suter Notes at 1-5 (dated April 7, 2016)(A.R. at 129-33)).  Dr. Cary Suter evaluated Chandhok for left arm and left leg numbness.  <u>See</u> Memo. ¶ 34, at 7 (citing Dr. Suter Notes at 1-5 (A.R. at 129-33)).  Dr. Suter stated that Chandhok was limping and using a cane because of his heel spur, but he noted that Chandhok was otherwise able to walk "'normally with no signs of ataxia'" and that "'[b]oth the left upper and lower extremities show normal muscle bulk with no evidence for atrophy.  Muscle tone is normal there are no signs of spasticity.'"  Memo. ¶ 35, at 7 (quoting Dr. Suter Notes at 4 (A.R. at 132)).  Dr. Suter further noted that "'[r]efexes are 1 -- and symmetric in all 4 extremities and there are no pathologic reflexes.  He has normal strength, 5/5, both proximal and distal.  He has intact sensation to all modalities.'"  Memo. ¶ 36, at 8 (quoting Dr. Suter Notes at 4 (A.R. at 132)).

- 6 -

Dr. Garcia saw Chandhok again on April 13, 2016, and he noted that an MRI report showed protruding disks and planned to refer him for a cervical epidural.  See Brief at 10; (April 13 Dr. Garcia Notes at 1 (dated April 13, 2016)(A.R. at 125).  On June 20, 2016, Dr. Garcia saw Chandhok again and noted minimal swelling in his left knee.  See Brief at 10; June 20 Dr. Garcia Notes at 1 (dated June 20, 2016)(A.R. at 116).  Later, on June 28, 2016, Dr. Garcia completed the Attending Physician Statement on Chandhok's disability benefit application.  See Memo. ¶ 27, at 6 (citing Application at 8-9 (A.R. at 2749-50)).  Dr. Garcia stated at that time that Chandhok's condition had an "onset date" of January 9, 2016, and a "'paper filing'" date of March 10, 2016. Memo. ¶ 30, at 7 (quoting Application at 8 (A.R. at 2749)).  Dr. Garcia did not explain the distinction between these two dates.  See Memo. ¶ 31, at 7 (citing Application at 8 (A.R. at 2749-50)).  Dr. Garcia wrote that Chandhok was still disabled for work.  See Memo. ¶ 37, at 12 (citing June 28 Dr. Garcia Notes at 1 (dated June 28, 2016)(A.R. at 109).  He also prescribed Chandhok an anti-depressant.  See Brief at 10; June 28 Dr. Garcia Notes at 2 (A.R. at 110).  Dr. Garcia strongly recommended that Chandhok receive specialty care.  See Memo. ¶ 37, at 12 (citing June 28 Dr. Garcia Notes at 1 (A.R. at 109)).

Chandhok, accordingly, went to Dr. Paul Legant, an orthopedic surgeon in Albuquerque, for an independent medical exam.  See Memo. ¶¶ 37-39 (citing June 5 Dr. Legant Notes at 1-7 (dated June 5, 2016)(A.R at 560-66); Medical Certificate for Return to Work at 1 (dated July 5, 2016)(A.R. at 666)).  Dr. Legant evaluated Chandhok on July 5, 2016.  See Memo. ¶ 39, at 8 (citing June 5 Dr. Legant Notes at 1-7; Medical Certificate for Return to Work at 1).  He prepared a report "'from the orthopedic and neurologic standpoint[, referencing Chandok's] spine upper and lower extremities.'"  Memo. ¶ 39, at 8 (June 5 Dr. Legant Notes at 7).  Dr. Legant gave Chandhok a one

percent permanent impairment for his right foot and ankle based on his plantar fasciitis.  See Brief at 13 (citing Dr. Legant Treatment Notes at 1 (dated July 26, 2016)(A.R. at 572)).  Dr. Legant provided Chandhok a note allowing him to return to work without limitations.  See Memo. ¶ 39, at 8 (citing June 5 Dr. Legant Notes at 1 (A.R. at 566)).  Chandhok's physical therapy reports from this time period note his difficulties walking, his pain after walking more than ten minutes, and his antalgic[4] gait.  See Brief at 12; Records from New Mexico Orthopaedics at 1-4 (dated August 19, 2016)(A.R. at 30-33).

Companion Life reviewed Chandhok's claim on September 15, 2016 and concluded that the only condition supporting impairment was his plantar fasciitis diagnosis.  See Memo. ¶ 41, at 8 (citing Medical Review Form at 5 (A.R. at 2556)).  Companion Life further concluded:

> The claimant is reporting multiple symptoms which include knee pain, neck pain and low back pain that date back to a work related injury in January 2016; however, he continued to work up until March 4, 2016.  Please refer to the analysis for more detail.  The fact that the claimant was able to work for two months with these symptoms, does not support impairment. In addition, when he first presented to Dr. Garcia on 3/18/16, there was no mention of knee pain or electric shock type pain on top of the head.  It is not clear when these symptoms actually first appeared and how they are impacting function.

Memo. ¶ 41, at 8 (citing Medical Review Form at 5 (A.R. at 2556)).  Companion Life denied Chandhok's claim on September 21, 2016.  See Memo. ¶ 42, at 9 (citing Letter from Marc Scully to Paul Chandhok at 1-3 (dated Sept. 21, 2016)(A.R. at 10-12)("Scully Letter")).  Chandhok appealed the decision on February 22, 2016.  See Memo. ¶ 43, at 9 (citing Letter from Paul Chandhok to Marc Scully at 1 (dated Feb. 22, 2017)(A.R. at 2)).  Chandhok argued in the appeal

---

[4]"Antalgic" is defined as "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)."  Meriam-Webster Dictionary, "Antalgic," https://www.merriam-webster.com/medical/antalgic (last accessed August 8, 2020).

that he had "'severe difficulty from my head to my leg, and under this stress, depression also.'" Memo. ¶ 44, at 9 (quoting Letter from Paul Chandhok to Marc Scully at 1 (A.R. at 2)).  On January 17, 2017, Chandhok met with Kevin Heiskala, a clinical social worker, who evaluated Chandhok's mental health.  See Brief at 9 (citing Heiskala Notes at 1-13 (dated Jan. 17, 2017)(A.R. at 751-763)).

On August 9, 2016, Dr. Garcia examined Chandhok and noted a minimally swollen left knee.  See Brief at 10; Aug. 9 Dr. Garcia Notes at 4 (dated Aug. 9, 2016)(A.R. at 852).  On August 17, 2016, Dr. Garcia dictated a letter stating his opinion that Chandhok was not ready to return to work because of ongoing pain and the sedating effect of his current medication.  See Brief at 10; Aug. 17 Dr. Garcia Notes at 5 (dated Aug. 17, 2016)(A.R. at 853).  On December 15, 2016, Dr. Garcia noted that Chandhok had a tender right heel, and severe anxiety and depression.  See Brief at 10; Dec. 15 Dr. Garcia Notes at 1-4 (dated Dec. 15, 2016)(A.R. at 856-59).  On January 6, 2017, Dr. Garcia wrote that he was "very concerned" about Chandhok's mental state.  Brief at 10 (citing January 6 Dr. Garcia Notes at 1 (dated June 6, 2017)(A.R. at 860)).  On January 17, 2017, Dr. Legant wrote that he thought "'it would be fine to see his podiatrist for further care of his right foot and heel.'"  Brief at 13 (quoting Jan. 17 Dr. Legant Notes at 1 (dated Jan. 17, 2017)(A.R. at 568)).

Companion Life reviewed Chandhok's file again on August 4, 2017.  See Memo. ¶ 46, at 9 (citing Second Medical Review Form at 1-7 (dated Aug. 4, 2017)(A.R. at 283-89)).  It concluded, again, that only plantar fasciitis impaired Chandhok from March 15, 2016, until July 5, 2016.  See Memo. ¶ 47, at 9 (citing Second Medical Review Form at 1-7 (A.R. at 283-89)).  It also concluded

that the medical information provided does not support impairment preventing Chandhok from performing light and sedentary activities:

> The claimant's reported pain severity does not appear to correlate with the clinical assessments and diagnostics.  The claimant's electromyography[5] on 04/07/16 was within normal limits.  The MRI of his thoracic and cervical spine on 03/25/16 demonstrated mild findings.  The x-ray of his left knee on 04/13/16 demonstrated minimal degenerative changes.  His MRI of his lumbar spine on 05/25/16 also demonstrated mild findings.  His physical assessment in the emergency room on 03/11/16 demonstrated no neurological abnormalities and a normal gait.  His physical assessment with neurologist Dr. Suter on 04/07/17 demonstrated limping and use of a cane due to his right heel pain however, he had normal strength, muscle tone, sensation, no swelling and no signs of spasticity.

Memo. ¶ 48, at 9 (quoting Second Medical Review Form at 6 (A.R. at 288)).  Companion Life denied Chandhok's appeal on August 25, 2017.  See Memo. ¶ 49, at 9 (citing First Letter at 1-4 (dated Aug. 25, 2017)(A.R. at 968-71)).

Chandhok began to see Dr. Zachary Haas, a podiatrist at Albuquerque Associated Podiatrists, in September, 2017.  See Brief at 10-11 (citing Dr. Haas Notes (dated March 22, 2017)(A.R. at 867-75)).  On February 15, 2018, Dr. Ronald Romanik, an Albuquerque-based psychiatrist, performed a psychiatric evaluation of Chandhok.  See Brief at 9 (citing Dr. Romanik Notes at 1-17 (A.R. at 806-822)).  Dr. Romanik saw Chandhok again on March 1, 2018, March 15, 2018, April 17, 2018, and April 26, 2018.  See Brief at 9 (citing Dr. Romanik Notes at 1-17 (A.R. at 806-822)).  On April 26, Chandhok and Dr. Romanik discussed the possibility of hospitalization if his condition did not improve.  See Brief at 9 (citing Dr. Romanik Notes at 3 (A.R. at 808)).

---

[5]Electromyography is a diagnostic procedure that assess muscle and muscle nerve cell health.  See "Electromyography (EMG)," The Mayo Clinic, last accessed August 5, 2020, https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913.

Chandhok appealed again in early 2018, and he supplied additional medical records, including those relating to his psychiatric treatment.  See Memo. ¶ 50, at 10 (citing Letter from James Rawley to Sandra Kaserman (dated July 3, 2018)(A.R. at 734)).  Companion Life reviewed Chandhok's claim again on August 8, 2018.  See Memo. ¶¶ 51-52, at 10 (citing Third Medical Review Form at 1-5 (dated Aug. 8, 2018)(A.R. at 1853-57)).  It did not change its assessment of Chandhok's plantar fasciitis, left knee pain, lower back pain, and left upper extremity radicular pain.  See Memo. ¶ 53, at 10 (citing Third Medical Review Form at 4 (A.R. at 1856)).  Companion Life reviewed records relating to Chandhok's adjustment disorder, anxiety, and depression.  See Memo. ¶ 54, at 10 (citing Third Medical Review Form at 3 (A.R. at 1855)).  These records are dated nearly a year after Chandhok's last day of work, and Companion Life concluded that they did not support impairment.  See Memo. ¶ 55-56, at 10; Third Medical Review Form at 1-5 (A.R. at 1853-57).

Companion Life denied Chandhok's appeal on August 24, 2018.  See Memo. ¶ 57, at 11 (citing Second Letter from Sandra Kaserman to James Rawley at 1-3 (dated Aug. 24, 2018)(A.R. at 721-23)("Second Letter")).  Companion Life's denial letter recites a policy provision: "'Your coverage will end on the earliest of the following . . . the last day of the month on or next following the month in which your employer terminates your employment.'"  Brief at 15 (quoting Second Letter at 1 (A.R. at 721)).  It notes that, because Chandhok was not covered under the Policy after March 4, 2016, he is not entitled to disability benefits.  See Brief at 15 (citing Second Letter at 3 (A.R. at 723).  Companion Life also stated that the medical evidence did not support impairment until March 15, 2016.  See Brief at 13 (citing Second Letter at 3 (A.R. at 723)).

**PROCEDURAL BACKGROUND**

Chandhok filed his complaint on February 28, 2019, in state court.  See Complaint for

ERISA Plan Benefits, filed in Second Judicial District Court, County of Bernalillo, State of New

Mexico, filed in federal court April 19, 2019 (Doc. 1-1)("Complaint").  Companion Life removed

this case to the United States District Court for the District of New Mexico on April 19, 2019.  See

Notice of Removal, filed April 19, 2019 (Doc. 1).  Chandhok filed the Brief on January 3, 2020,

and Companion Life filed its Motion on January 10, 2020.  The parties addressed and resolved a

dispute over the standard of review at the January 30, 2020, Hearing.  See Transcript of Hearing

at 2:14-15:17, taken January 30, 2020 (Court, Bachrach, Rawley)("Tr.").[6]

### 1.      The Brief.

After presenting the case's facts, Chandhok gives an overview of his legal argument.  See

Brief at 6.  He argues that Companion Life's denial of coverage is arbitrary and capricious, because

it does not credit that Chandhok was sent home for health reasons on March 4, 2016, presents no

evidence Chandhok was not injured on that date, and only accepts that he was injured on March

15, 2016, the day a doctor examined him.  See Brief 6-7.  Chandhok therefore asserts that he is

entitled to insurance coverage on March 3-4, 2016, and March 15, 2016.  See Brief at 7.  Chandhok

also raises a Policy interpretation question for the Court, suggesting that it must decide whether

the Policy's duration provision modifies the "Active Employee clause" such that an employee

must be active in the month he or she suffers the disability.  Brief at 7.  Finally, Chandhok argues

that the conclusion that his disability ended on July 5, 2016, is also arbitrary and capricious in light

of his ensuing medical history.  See Brief at 8.

---

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Chandhok argues that the Policy does not state that the insured must prove disability with a doctor's visit on the day of disability.  <u>See</u> Brief at 21-22 (citing A.R. 209, 211).  He states that the Policy instead says that insureds qualify for disability benefits when they "'[b]ecome disabled while insured under the policy,'" Brief at 21 (quoting Policy at 27 (A.R. at 211)), and that coverage can terminate on "'[t]he last day of the month or on next following the month in which your Employer terminates your employment; the date you cease to be a Full-Time Active Employee in an eligible class for any reason,'" Brief at 22 (quoting Policy at 25 (A.R. at 209)).  He argues that the facts show that he had insurance coverage on March 4, 2016, through the end of the month, because on that day he was sent home for limping.  <u>See</u> Brief at 22.  He argues that, even if March 15, 2016, was the day his disability began, the Policy's language covers his disability.  <u>See</u> Brief at 22.

Chandhok then disputes Companion Life's argument that he was not an active employee on March 4, 2016, or March 15, 2016.  <u>See</u> Brief at 22.  He states that, while Companion Life disputes his contention that he was sent home from work on March 4, 2016, for limping, it has not gathered information to dispute this fact as the law requires.  <u>See</u> Brief at 22 (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 113 (1989)("<u>Firestone</u>"); <u>Gathier v. Aetna Life Ins.</u>, 394 F.3d 792, 807-08 (10th Cir. 2004)).  He argues that an insurers' decision made without procedural protections is not entitled to judicial deference.  <u>See</u> Brief at 23-24 (citing ERISA Claims Procedures, 65 Fed. Reg. 70246, 70255 n.39 (Nov. 21, 2000)).  He also asserts that he met the Policy's Active Employee requirement on March 4, 2016, but that Companion Life argues that he was not an active employee on March 15, 2016.  <u>See</u> Brief at 24.  He states that Companion Life's

interpretation is contrary to the Policy and that the Court should resolve ambiguity in his favor. See Brief at 24.

Chandhok then discusses Nance v. Sun Life Assurance Co. of Canada, 294 F.2d 1263 (10th Cir. 2002), in which the United States Court of Appeals for the Tenth Circuit affirmed a summary judgment ruling in the insurer's favor. See Brief at 24-25. Chandhok contends that, in that case, the injured employee left work in September after getting injured in July, but the facts showed that the employee was not yet suffering injuries when he left. See Brief at 24. According to Chandhok, the policy in that case stated that a covered injury had to occur while the employee was employed and that an occurrence that later led to an injury was not sufficient to invoke coverage. See Brief at 24-25. Chandhok says that, in his case, the Policy "states only that the insured must be an active worker when disability begins." Brief at 25. He argues that requiring a medical record to prove disability on March 4, 2016, is an impermissible Policy interpretation. See Brief at 25.

Chandhok also cites Weber v. GE Group Life Assurance Co., 541 F.3d 1002 (10th Cir. 2008), which analyzed a policy's requirement that an employee be actively at work. See Brief at 25. He states that the Tenth Circuit in that case concluded that such a requirement meant an employee had to be at work the day he became eligible for benefits and not afterwards. See Brief at 25-26. He argues that Companion Life's insistence that he see a doctor to document his disability imposes this restriction without language in the Policy supporting it. See Brief at 26. In conclusion, Chandhok "prays the Court to reverse the denial and award benefits, and for such other and further relief as the Court deems just and proper." Brief at 26-27.

2.      **The Motion and Memo.**

Companion Life attaches a separate brief in support of its Motion.  See Memo. at 1.
Companion Life first argues that Chandhok's work history negates a claim of disability beginning
on March 4, 2016.  See Memo. at 13.  It argues that Chandhok worked for two months after his
January, 2016, fall without changing how he worked and that he worked a full day on March 4,
2016.  See Memo. at 13-14.  It argues that Chandhok has not shown what changed during this time,
which is "especially problematic," because Melloy Brothers disputes that Chandhok was told to
go home and questions the validity of Chandhok's claim.  Memo. at 14.

Companion Life argues that Chandhok "overreaches" to prove an injury when he cites
records from long after his workplace accident.  Memo. at 14.  It argues that the most relevant
medical record is from Chandhok's visit to Lovelace Hospital on March 11, 2016, but the records
from that visit show tenderness in his left heel -- not his right heel -- and he did not go to Lovelace
Hospital for heel pain.  See Memo. at 14.  It also asserts that Chandhok has inconsistently reported
his injury, noting that his March 15, 2016, worker's compensation claim attributed his injury to
"'pounding the pavement.'"  Memo. at 14 (quoting Melloy Brothers Notes at 1 (dated March 15,
2016)(A.R. at 173)).

Next, Companion Life notes that the Policy requires claimants to submit documentation of
the date when the disability began and its cause.  See Memo. at 15 (citing Policy at 27, 32 (A.R.
at 211, 216)).  It asserts that Chandhok did not submit this documentation and that the Policy is
clear that coverage ends the day he stops working.  See Memo. at 15.  Companion Life disputes
Chandhok's reliance on Gaither v. Aetna Life Insurance Co., arguing that there is no evidence in
the record that confirms his theory of entitlement and that he has provided inconsistent information

about his disability's cause.  See Memo. at 15.  It contends that Chandhok has failed to sustain his burden on this score.  See Memo. at 15.

Companion Life Insurance then argues that there is no evidence Chandhok was impaired on March 4, 2016.  See Memo. at 16.  It asserts that it was entitled to objective proof of disability. See Memo. at 16 (citing Miller v. Monumental Life Ins. Co., 761 F. Supp. 2d 1123, 1135 (D.N.M. 2009)(Browning, J.)).  It contends that Chandhok can provide no objective evidence, because he did not seek medical treatment between his fall on January 9, 2016, and his last day of work on March 4, 2016.  See Memo. at 16.  It also notes that his treatment records after March 4, 2016, "were overwhelmingly normal and cannot support disability." Memo. at 16.  It argues that doctors ordered his March 10, 2016, CT scan for reasons unrelated to his fall, that the CT scan did not reveal any serious condition and that his blood pressure on March 11, 2016, was normal.  See Memo. at 17.  It notes that emergency room personnel wanted more tests and observation to further assess what they believed was neuropathy, but Chandhok left the hospital.  See Memo. at 17. While Companion Life admits that it considered Dr. Garcia's March 18, 2016, opinion that Chandhok could not work, it asserts that treatment records do not substantiate his opinion.  See Memo. at 18 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003); Lafayette v. Cobb, 385 F. Supp. 2d 1162, 1171 (D.N.M. 2005)(Hansen, J.)).  It contends that none of the medical issues that Dr. Garcia identified constitute proof of disability, see Memo. at 18 (citing Roach v. Prudential Ins. Brokerage, Inc., 62 F. App'x 294, 298 n.2 (10th Cir. 2003)(unpublished)), and that he did not identify clearly any disability's onset date, see Memo. at 18-19.  It then notes again that Chandhok does not explain how he could work between January 9, 2016, and March 4, 2016, but could not work afterwards.  See Memo. at 19.

Companion Life then discusses Chandhok's doctor's visits around early 2016.  See Memo. at 19.  It states that the delay between Lovelace Hospital's recommendation that he see a neurologist and his appointment "belies the seriousness of his complaints."  Memo. at 19.  It states that the neurologist's findings do not support a total disability claim.  See Memo. at 19-20. Companion Life then argues that Dr. Garcia's support of a disability claim is based on Chandhok's "self-reported symptoms and not any independent, objective analysis," which is legally insufficient to prove disability.  Memo. at 20.  It also contends that Dr. Legant's written release for Chandhok to return to work without restrictions is substantial evidence supporting its benefits denial.  See Memo. at 20.  Companion Life asserts that Chandhok does not explain how Dr. Legant's one-percent impairment assessment of Chandhok's foot equates to disability, especially when Dr. Legant assesses zero-percent impairment for Chanhok's other ailments.  See Memo. at 20. Companion Life asserts that, after reviewing Chandhok's medical file, it reasonably concludes that his reported pain severity is not correlated with clinical assessments and diagnoses.  See Memo. at 21 (citing Second Medical Review Form at 6 (A.R. at 288)).

Companion Life then argues that Chandhok's psychiatric evaluations also do not support a disability, because he began this treatment long after March 4, 2016, and they provide no support for an anxiety or depression-based medical impairment.  See Memo. at 21-22 (citing Third Medical Review Form at 3 (A.R. at 1855)).  It argues that this lack of support justifies its denial of Chandhok's claim.  See Memo. at 22.  Companion Life also disputes Chandhok's Policy interpretation.  See Memo. at 22.  It states that the Policy allows it to terminate coverage when an employee ceases to become a "'Full-time Active Employee,'" which occurred, for Chandhok, on

March 4, 2016.  Memo. at 23 (quoting Second Letter at 1 (A.R. at 721)).  It also argues that there is no ambiguity about this provision.  See Memo. at 23

Companion Life then discusses the cases on which Chandhok relies in support.  See Memo. at 24.  It argues that the Court should follow Nance v. Sun Life Assurance Co. of Canada v. Sun Life Assurance Co. and conclude that, as in that case, Chandhok is not entitled to benefits, because his disability arose after he stopped working and vague assertions support his claim.  See Memo. at 24.   It argues that Chandhok's case is very different from the claimant's in Weber v. GE Group Life Assurance Co., because there was evidence there that the claimant worked after his effective coverage date.  See Memo. at 24.  Here, Chandhok did not receive a diagnosis until March 15, and there is "no statement by Dr. Pacheco that Plaintiff was disabled weeks earlier."  Memo. at 25.

**3.      The Reply.**

Chandhok replied to the Motion and to the Memo.  See Reply at 1.  He first disputes that he did not have symptoms before March 5, 2016.  See Reply at 4.  He notes that Companion Life accepted his initial claim and only stopped paying benefits on July 5, 2016, after Dr. Legant's examination.  See Reply at 4.  Chandhok disputes that he ever implicitly recognized his own good health, arguing that he raised the January 9, 2016, fall every time he interacted with Companion Life.  See Reply at 4.

Chandhok then argues that, contrary to Companion Life's assertions, there are no inconsistencies in the record.  See Reply at 5.  He notes that Companion Life does not detail Melloy Brothers' concerns about his claim and did not follow up with Chandhok's supervisor, Roy Benson, to see if Benson sent Chandhok home on March 4, 2016.  See Reply at 5.  He says Companion Life's argument that there is no evidence that he was disabled on March 4, 2016,

overlooks Dr. Garcia's assessment, Dr. Legant's assessment, and the records of Chandhok's mental health providers.  See Reply at 5.

Next, Chandhok discusses what Companion Life asserts are inconsistencies in the medical records.  See Reply at 5.  He argues that records from his March 10, 2016, visit to the emergency room are pertain to a heart attack and not his work-related disability, and thus are not relevant.  See Reply at 5.  He also argues that Companion Life disputes Dr. Garcia's claims for no clear reason.  See Reply at. 5.  He notes that it provides no support for the claim that Melloy Brothers said Chandhok was able to perform his job duties adequately between January 9, 2016, and March 4, 2016.  See Reply at 6.  Chandhok also says that Companion Life ignores Dr. Pacheco's March 15, 2016, notes in concluding that there is no early evidence of mental health problems.  See Reply at 6.

Chandhok then argues that he did not cease to be a full time employee on March 4, 2016.  See Reply at 6.  He says that Melloy Brothers was not aware whether or when he would return, and he argues that there is no evidence in the AR that his employment ended on that date.  See Reply at 6.  He notes that employees leave work without pay all the time, and it is "illogical to find he had quit or declared his intent not to return the day he was sent home."  Reply at 6.  For all these reasons, Chandhok argues that Companion Life's decision to deny him benefits is arbitrary and capricious.  See Reply at 7.

### 4.   **The Hearing.**

The parties first discussed the applicable standard of review.  See Tr. 2:14-15:17 (Court, Bachrach, Rawley).  Chandhok presented the question as whether review is under summary judgment or on a whole record review under Firestone's whole record review.  See Tr. at 2:24-3:2

(Rawley).  He argued that the caselaw suggests that a court reviews the whole administrative record

under Firestone and asks whether the insurer acted arbitrarily and capriciously.  See Tr. at 3:3-4:25

(Rawley).  He stated that, if the Court wanted summary judgment briefing, he could provide it, but

he believed that it would not be necessary after his presentation.  See Tr. at 5:1-10 (Rawley).

Chandhok then described Firestone's holding for the Court.  See Tr. at 5:20-6:8 (Rawley).

Companion Life then stated that the standard of review debate "is a bit of form over substance,"

Tr. at 6:21-22 (Bachrach), and the Tenth Circuit has stated that courts should not "get hung up" on

the summary judgment label, Tr. at 7:1-2 (Bachrach).  It argued that a summary judgment motion

is the vehicle for bringing the issue before courts, but that the inferences which usually accompany

summary judgment motions do not apply.  See Tr. at 7:3-8:10 (Bachrach).

     Companion Life noted that Chandhok had raised another argument questioning the

standard of review.  See Tr. at 8:11-12 (Bachrach).  It argued that the standard is either arbitrary-

and-capricious or de novo review, and that, under Firestone, when a plan grants discretionary

authority, courts review decisions to determine whether they are is arbitrary and capricious.  See

Tr. at 8:12-18 (Bachrach).  Companion Life noted that Chandhok has not argued that a conflict

exists, see Tr. at 8:18-25 (Bachrach), and he also does not argue in the Brief that he is entitled to

de novo review, see Tr. at 9:1-17 (Bachrach).  Companion Life then clarified that the Court does

not have to find undisputed facts when reviewing an Employee Retirement Income Security Act

("ERISA") claim in this procedural posture.  See Tr. at 9:18-25 (Court, Bachrach).  Companion

Life argued that, in these cases, the question is whether the insurance company reached a

reasonable conclusion based on their facts.  See Tr. at 10-7:19 (Bachrach).

Chandhok responded and said that there seems to be some agreement between the two parties, and he would leave to the Court the question whether he waived arguing de novo review. See Tr. at 11:1-12 (Rawley).  He stated that the arbitrary-and-capricious standard is flexible depending on how the defendant insurance company approached its investigation.  See Tr. at 11:13-12:15 (Rawley).  He also noted that an insurer has a fiduciary duty to implement its plan and that if a Court concludes the insurer has not investigated enough, it reviews the record de novo. See Tr. at 12:15-13:22 (Rawley).

Chandhok then turned to the case's merits.  See Tr. at 16:21 (Rawley).  He began by reviewing events surrounding March 4, 2015, including his decision to leave work, his visit to the ER, and his podiatry appointment.  See Tr. at 17:8-18:12 (Rawley).  Chandhok stated that Companion Life is arguing that he was disabled on March 15, 2016, but not before that date.  See Tr. at 18:13-19:9 (Rawley).  He cited page 173 of the A.R., Melloy Brother's claim notification, as evidence that he had suffered pain much earlier than March 15, 2016.  See Tr. at 19:10-20 (Rawley).  He then cited the Notice of Accident he completed on March 22, 2016, which described his January 9, 2016, fall.  See Tr. at 19:20-20:1 (Rawley).  Chandhok asked, given that Melloy Brothers sent him home from work on March 4, 2016, "how is it that any rational person can claim that he was not demonstrating a degree of disability prior to [] March 5th?"  Tr. at 20:7-9 (Rawley). He noted that his employment had not ended with Melloy Brothers on March 4, 2016, because Melloy Brothers continued to pay him.  See Tr. at 20:9-20 (Rawley)(citing Paystub at 1 (dated June 21, 2016)(A.R. at 245)).  Thus, Chandhok asserts, he retains Policy coverage.  See Tr. at 20:23-21:10 (Rawley).

Chandhok next argued that he showed mental health problems from the beginning of the claims process.  See Tr. at 21:10-23 (Rawley).  He discussed the Policy's language and stated that Companion Life must believe that, under its terms, Chandhok ended his employment status once he stopped working.  See Tr. at 21:24-23:8 (Rawley)(citing Policy at 25, 27 (A.R. at 209, 211)).  Chandhok reiterated that he was still employed on March 15, 2016, and so he became disabled while insured under the Policy.  See Tr. at 23:9-17 (Rawley)(citing Policy at 27 (A.R. at 211)).  Chandhok asserted that Companion Life did very little investigation into his claim.  See Tr. at 23:18-25:8 (Rawley).  He hypothesized that, once Companion Life heard that Melloy Brothers questioned the validity of Chandhok's claim, it stopped reviewing it.  See Tr. at 25:9-21 (Rawley).

Chandhok then discussed the medical records that underlie his claim.  See Tr. at 25:22 (Rawley).  He noted that his visit to the emergency room on March 11, 2016, was over concerns that he was having a heart attack and that records from that visit are not particularly relevant.  See Tr. at 25:22-26:9 (Rawley).  Chandhok said that, during his appointment with Dr. Pacheco, Chandhok said that he had shown symptoms for three weeks.  See Tr. at 26:9-23 (Rawley).  Chandhok also noted that Dr. Garcia diagnosed him with a bone spur on March 18, 2016, and bone spurs take a long time to develop.  See Tr. at 26:10-27:10 (Rawley).  He also said that Companion Life never hired its own doctor to review Chandhok's bone spur.  See Tr. at 27:6-10 (Rawley).  Chandhok then said that, after examining him on April 7, 2016, Dr. Suter wrote after a physical examination that Chandhok was limping and using a cane, because of an unresolved heel spur.  See Tr. at 27:11-28:3 (Rawley).  Chandhok then reviewed his June 28, 2016, appointment with Dr. Garcia and his July, 2016, appointments with Dr. Legant, all of which, he argued, suggest that Chandhok was injured before March 5, 2016.  See Tr. at 28:4-29:21 (Rawley).  Chandhok argued

next that Kevin Heiskala's deposition and Dr. Romanik's notes show that he had depression and anxiety. See Tr. at 30:10-22 (Rawley); id. at 31:18-32:16 (Rawley).

Chandhok then reviewed letters from Chandhok's counsel and Companion Life that are in the A.R. See Tr. at 32:17 (Rawley). Chandhok reviewed his application for long term disability benefits, which notes that he spends about eighty percent of his time walking. See Tr. at 33:1-34:3 (Rawley). He discussed Dr. Garcia's statement on Chandhok's application that Chandhok was unable to work on March 4, 2016, and dismissed Companion's Life concerns that Dr. Garcia had ambiguously addressed when Chandhok began to suffer his disabling conditions. See Tr. at 34:3-23 (Rawley). Next, Chandhok read from Companion Life's letter denying benefits, and he noted that Companion Life based its denial on the fact that Chandhok was able to work for two months after the accident. See Tr. at 34:24-35:23 (Rawley). Chandhok also questioned where Companion Life gained support for its statement that his plantar fasciitis diagnosis supported a one or two week impairment, see Tr. at 35:23-36:9 (Rawley), and he noted that Companion Life did not state which Policy clause it used to deny coverage, see Tr. at 36:9-25 (Rawley).

Chandhok states that his counsel, James Rawley, attempted to address Companion Life's concerns in a May 9, 2017, letter, and that Mr. Rawley told Companion Life that Chandhok was injured on January 9, 2016, that his condition worsened over time and that it was not clear why Companion Life denied coverage. See Tr. at 37:1-38:14 (Rawley). Chandhok noted that Companion Life reviewed his claim again, including several new doctors' reports that Chandhok included, and Companion Life still concluded that there is no medical evidence that he had right heel pain before March 15, 2016. See Tr. at 38:15-40:25 (Rawley). He argued that, based on

Companion Life's denial, "apparently they don't accept medical doctors saying that the history of foot pain and heel pain there is medical evidence."  Tr. at 41:1-3 (Rawley).

Chandhok then stated that he does not understand how Companion Life can argue that, if a claimant's employer questions the claim's validity, then Companion Life does not have to believe anything the claimant says and do not have to conduct further research into the claim.  See Tr. at 41:18-25 (Rawley).  He says that, according to Companion Life, Chandhok should have only had a very brief issue with his heel spur and plantar fasciitis, and "the fact that no doctor says that doesn't seem to phase them nor does it make them want to get their own doctor to look at it."  Tr. at 43:3-6 (Rawley).  He argues that Companion Life ignored the records of "every doctor" saying he was hurt between January 9, 2016, and March 4, 2016.  See Tr. at 43:17-44:1 (Rawley).  Chandhok also asserted that Companion Life ignored Mr. Rawley's requests to re-evaluate this information and, instead, each time, reiterated its same reasons for denying Chandhok coverage.  See Tr. at 44:3-45:10 (Rawley).  Chandhok argued that this pattern includes his most recent attempt on August 8, 2018, when he submitted additional information concerning his mental health conditions.  See Tr. at 45:11-46:10 (Rawley).  Chandhok stated that this new information did not make a difference to Companion Life.  See Tr. at 46:14-25 (Rawley).  He argued that he did not know what a mental or nervous impairment was if medical records indicating a patient has suicidal ideation and needs medication do not suffice.  See Tr. at 47:4-10 (Rawley).

Chandhok then presented his legal arguments.  See Tr. at 48:3-7 (Court, Rawley).  He first discussed Rasenack ex rel. Tribolet v. AIG Life Insurance Co., 585 F.3d 1311 (10th Cir. 2009), see Tr. at 48:8-21 (Rawley), and stated that, because Companion Life took too long to review and decide his claim under the Policy's terms, it is therefore not entitled to Firestone deference, see Tr.

at 48:22-49:2 (Rawley).  He also argued that Companion Life did not satisfy its fiduciary duty of investigation under <u>Gaither v. Aetna Life Insurance Co.</u>  <u>See</u> Tr. at 49:2-50:6 (Rawley).  According to Chandhok, not asking Melloy Brothers whether he was sent home on March 4, 2016, for limping was contrary to these cases' holdings and "beyond the pale in terms of failure to investigate."  Tr. at 50:19-20 (Rawley).  <u>See</u> <u>id.</u> at 50:7-24 (Rawley).  Chandhok argued that the length of time which it took Companion Life to deny his claim and its failure to investigate require de novo review rather than an arbitrary-and-capricious standard.  <u>See</u> Tr. at 51:14-21 (Rawley).

Chandhok next discussed <u>Nance v. Sun Life Assurance Co. of Canada</u>.  <u>See</u> Tr. at 51:21-24 (Rawley).  He argued that this case requires a claimant to become disabled while employed and before an employee is terminated.  <u>See</u> Tr. at 51:24-52:10.  Chandhok argued that this case illustrates that he did not cease to become a full-time employee under the Policy on the last day he worked.  <u>See</u> Tr. at 52:10-21 (Rawley).  Chandhok then analyzed <u>Horn v. Cendant Operations, Inc.</u>, 69 F. App'x 421 (10th Cir. 2003), and argued that it does not require an employee to have a medical opinion before coverage applies.  <u>See</u> Tr. at 52:11-53:21 (Rawley).  Next Chandhok argued that, in <u>Weber v. GE Group Life Assurance Co.</u>, the Tenth Circuit interpreted similar language to that in Companion Life's Policy.  <u>See</u> Tr. at 53:22-54:10 (Rawley).  Chandhok asserts that, in that case, an employee was held to be an active employee when she worked for five hours on the first day of the month.  <u>See</u> Tr. at 55:10-25 (Rawley).  He argued that, under this standard, he should also qualify as a full-time employee.  <u>See</u> 56:1-15 (Rawley).

Chandhok then discussed the Court's 2009 ruling in <u>Miller v. Monumental Life Insurance</u>.  <u>See</u> Tr. at 56:16-19 (Rawley).  After reviewing the case's facts and procedural posture, he suggested that the Court review this opinion to determine whether it should require Companion

Life to get a statement from Benson at Melloy Brothers whether he sent Chandhok home on March

4, 2016.  See Tr. at 56:20-58:4 (Rawley).  Chandhok noted that the Tenth Circuit ultimately

remanded in Miller v. Monumental Life Insurance, and he argued that the record here reflects that

Companion Life conducted a poor investigation and that there is insufficient evidence to support

denying benefits.  See Tr. at 58:5-59:20 (Rawley).  Chandhok also argued that, under Tenth Circuit

precedent, insurers must keep claimants reasonably well-informed, and Companion Life did not

tell him what further evidence it needed from him during its claim investigation.  See Tr. at 59:21-

61:4 (Rawley).  Further, Chandhok asserted that insurance policies must be written in plain

language, and he argued that his own reasonable expectations should inform the Court's analysis

of the Policy's language.  See Tr. at 61:5-62:11 (Rawley).  He also stated that federal law governs

the determination whether an ERISA insurance policy is ambiguous.  See Tr. at 62:12-25

(Rawley).  Chandhok argued that this Policy is ambiguous, because it does not define full-time

active employee clearly and leaves uncertain how one ceases being a full-time employee.  See Tr.

at 62:25-63:10.

Chandhok then argued that, under Tenth Circuit precedent, the arbitrary-and-capricious

standard is difficult for plaintiffs to overcome.  See Tr. at 65:5-66:2.  He noted, however, that,

although there is no objective medical evidence supporting the pain which Chandhok felt,

Companion Life cannot reject his claim, because it is a claim which is impossible to support with

objective medical evidence.  See Tr. at 66:2-67:1 (Rawley).  Chanhok urged the Court to consider

the circumstantial evidence supporting his pain.  See Tr. at 67:1-68:16 (Rawley).  He argued that

there is no support in the record for a hypothetical argument that bone spurs occur spontaneously,

and Companion Life asserted that there was no evidence that Chandhok was in pain before his

diagnosis.  See Tr. at 68:17-69:8 (Rawley).  He argued that he worked through pain for two months and that this does not show that he was not in pain.  See Tr. at 69:9-70:4 (Rawley).  Finally, Chandhok discussed Black and Decker Disability Plan v. Nord, and he argued that it holds that courts do not have to credit specially the claimant's physician's opinion but can also credit reliable, conflicting evidence.  See Tr. at 70:4-12 (Rawley).  He argued that no physician's assessment shows that Chandhok was not having pain since January 9, 2016.  See Tr. at 70:12-18 (Rawley).

Chandhok then reviewed and summarized his legal argument.  See Tr. at 70:18 (Rawley). He argued that he was not fired and that there is no reason to believe that he was not an employee after March 5, 2016.  See Tr. at 70:19-71:24 (Rawley).  He noted that people who get hurt while working will miss work, "and so for them to be cut off just when they become disabled saying they don't have coverage is to me illogical and very unfair and not clearly called" for by the Policy's language.  Tr. at 71:25-72:3 (Rawley).  Chandhok also reiterated that Companion Life performed inadequate investigation to refute his allegation of suffering additional mental impairments from his initial accident.  See Tr. at 72:7-18 (Rawley).  Chandhok argued that Companion Life performed no meaningful analysis of his mental health allegation and that the claim's denial was therefore arbitrary and capricious.  See Tr. at 72:19-73:6 (Rawley).  Finally, Chandhok asserted that, if the Court reverses, Companion Life will likely get more information from Melloy Brothers concerning Chandhok's workplace accident.  See Tr. at 74:7-74:5 (Rawley).

Companion Life then argued in response.  See Tr. at 75:9-11 (Court, Bachrach).  It began by arguing that Mr. Rawley made a number of incorrect statements concerning its position.  See Tr. at 75:13-16 (Bachrach).  It noted that the Policy defines active employee to include only employees who are actively at work on their scheduled workdays.  See Tr. at 75:25-76:9

(Bachrach). Companion Life argued that Chandhok's coverage thus clearly ceased when he stopped working on March 4, 2016. See Tr. at 76:9-12 (Bachrach). Companion Life next noted that the Policy clearly states that insureds must become disabled while insured under the Policy before they become entitled to benefits. See Tr. at 76:13-20 (Bachrach)(citing Policy at 27 (A.R. at 211)). It also distinguished cases holding that a claimant who worked through injury could still claim disability, because in all those cases the claimant already had sought medical treatment. See Tr. at 76:21-77:13 (Bachrach). Here, Companion Life argued, there is no evidence that he had any medical issues, and therefore, it did not have a duty to investigate Chandhok's claims. See Tr. at 77:13-17 (Bachrach). Companion Life instead argued that Chandhok had the burden to prove his injury during this time. See Tr. at 77:17-78:4 (Bachrach). Companion Life also contended that it investigated Chandhok's claims, but that Melloy Brothers disputed his account and that "if he thought more was needed in response to our investigation that's his burden." Tr. at 78:8-9 (Bachrach). Companion Life also argued that there is insufficient evidence to justify a medical impairment based on Chandhok's mental health issues. See Tr. at 78:10-79:8 (Bachrach). It argued that Chandhok is wrong that Companion Life ignored his most recent filings. See Tr. at 79:9-21 (Bachrach)(citing Second Medical Review Form at 1-7 (A.R. at 283-89)).

Next, Companion Life discussed Rasenack ex rel. Tribolet v. AIG Life Ins Co., and it argued that Chandhok was "just throwing things against the wall here" to analogize his facts to the case. Tr. at 80:10-11 (Bachrach). It noted that case concerned an entirely different appeals process than is present here. See Tr. at 80:11-17 (Bachrach). It also argued that Weber v. GE Group Life Assurance Co. concerns "a totally different issue," because it was about whether a claimant was working at the time coverage began and not when it terminated. Tr. at 80:21-22 (Bachrach). It

clarified that conflict of interest is a factor in deciding whether the arbitrary-and-capricious standard applies, but there is no general flexibility in the arbitrary-and-capricious standard.  See Tr. at 81:15-22 (Bachrach).  It also argued, again, that Chandhok has not met his burden of supplying objective evidence of impairment.  See Tr. at 81:23-82:7 (Bachrach).

Companion Life then reviewed the case's facts.  See Tr. at 82:10-11 (Bachrach).  It noted that the record contains numerous inconsistencies and that it has to make only a reasonable decision based on these inconsistencies.  See Tr. at 82:11-19 (Bachrach).  It asserted that Chandhok waited two months before he attempted to see a doctor and eventually had an appointment "long after he stop[ped] working."  Tr. at 83:10 (Bachrach).  It noted further that Dr. Garcia did not mention any heel pain in his attending physician statement.  See Tr. at 83:16-84:3 (Bachrach). Companion Life also asserted that Chandhok's emergency room visit on March 10, 2016, is important, because those records reflect that he denies any problems walking and does not mention his heel issues.  See Tr. at 84:19-85:2 (Bachrach).  Companion Life noted that, when Dr. Pacheco finally diagnosed Chandhok, Chandhok did not mention any specific injury that caused Chandhok's pain.  See Tr. at 85:6-14 (Bachrach).  It stated that subsequent testing showed that Chandhok had only mild symptoms, and, when Chandhok saw Dr. Legant, Dr. Legant concluded that he could return to work without restrictions.  See Tr. at 85:15-86:7 (Bachrach).  Companion Life further argued that Dr. Legant's reports on Chandhok do not support his case in any way.  See 86:8-20 (Bachrach).  Companion Life argued that all it needs to support its denial is a reasonable basis, see Tr. at 86:20-24 (Bachrach), and that there is substantial evidence in the record supporting this conclusion, see Tr. at 87:5-88:10 (Bachrach).

Companion Life then asserted that Chandhok erroneously states in his briefing that Chandhok received some benefits under the Policy.  See Tr. at 88:11-14 (Bachrach).  It further noted that the Policy has a ninety-day period during which the claimant must remain injured to receive benefits.  See Tr. at 88:14-22 (Bachrach).  It stated that Chandhok changed his story over time when he realized he could receive benefits and that it did not think that Chandhok fell on January 9, 2016.  See Tr. at 88:22-89:8.  It argued that Chandhok "clearly" was not injured as he alleges, because "it is just common sense that if he's having worsening problems he's going to see a doctor."  Tr. at 89:8 (Bachrach); id. at 89:11-13 (Bachrach).  It noted that Chandhok could have received emergency room treatment for his foot if it bothered him badly.  See Tr. at 89:13-18 (Bachrach).

Companion Life concluded its argument by stating again that it only had to prove that its decision was reasonable.  See Tr. at 89:24-90:6 (Bachrach).  It stated that this case is not a close one and that Chandhok's after-the-fact statements do not make it unreasonable for Companion Life to rely on contemporaneous medical records.  See Tr. at 90:6-15 (Bachrach).  It stated that Chandhok's pothole story has no corroborating evidence and only came about after he made other inconsistent statements.  See Tr. at 90:15-91:5 (Bachrach).  For these reasons, Companion Life asked that the Court enter judgment in its favor.  See Tr. at 91:5-8 (Bachrach).

Chandhok presented his final argument.  See Tr. at 91:12-14 (Court, Rawley).  Chandhok stated that he is unaware of any caselaw holding that Companion Life can be correct for any reason under the arbitrary-and-capricious standard, and instead argued that the Court must examine its reasoning.  See Tr. at 91:14-25 (Rawley).  If Companion Life's reasoning is arbitrary, Chandhok argued, the Court must overturn its decision.  See Tr. at 91:25-92:9 (Rawley).  Chandhok then

argued that it is not reasonable for Companion Life to argue that he was no longer covered on the day he was sent home.  See Tr. at 92:10-23 (Rawley).  He also disputed Dr. Legant's full release, because Dr. Legant only provided his assessment from an orthopedic and neurologic standpoint.  See Tr. at 93:2-10 (Rawley).  He reiterated that the record does not reflect that Melloy Brothers disputed his claim and that Companion Life did not investigate this claim.  See Tr. at 93:14-94:1 (Rawley).  He said that counsel for Companion Life's statement that he did not believe Chandhok concerned him, see Tr. at 94:2-10 (Rawley), because Chandhok sent Companion Life's counsel a neutral witness' deposition from a different case supporting this fact, see Tr. at 95:14 (Rawley).  Chandhok stated that the Court should not consider the opinion of Companion Life's counsel.  See Tr. at 95:23-96:12.   Chandhok then admitted that the Policy has a ninety-day disability requirement, see Tr. at 96:24-97:5 (Rawley), and disputed Companion's Life contention that Dr. Legant disbelieved Chandhok's claims, see Tr. at 97:10-14 (Rawley).

Chandhok concluded by stating that Companion Life could not argue away the case's facts. See Tr. at 97:15-19 (Rawley).  He said that it would have been very revealing if Companion Life honestly disputed his claim.  See Tr. at 97:20-98:4 (Rawley).  He then stated that the Policy does not support Companion Life's denial, and the only question should be how long Chandhok was covered.  See Tr. at 98:4-20 (Rawley).

Companion Life made its final points.  See Tr. at 98:21-23 (Court, Bachrach).  It stated that Companion Life's counsel ignores all evidence that it receives from opposing counsel that is outside the administrative record, and Companion Life said that the Court also cannot consider such information.  See Tr. at 98:23-99:7 (Bachrach).  It said that, after Melloy Brothers disputed Chandhok's claim, the burden became Chandhok's to prove disability.  See Tr. at 99:7-14

(Bachrach).  The parties then briefly discussed the remedy; Chandhok stated that the only way the Court could decide whether to remand or reverse is "to have some proffer made that there would be evidence on remand that would be useful, relevan[t] and material."  See Tr. at 100:2-14 (Court, Rawley).  Companion Life noted that there was no remand motion in the case and that "it's improper for a third time for counsel to say that there is something out there" that justifies remand. Tr. at 100:16-19 (Bachrach).

## LAW REGARDING ERISA

Congress enacted ERISA, 29 U.S.C. Chapter 18, to ensure the proper administration of employee benefit plans, including pension plans, both during the years of an employee's active service and after retirement.  See Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan, 433 F.3d 1091, 1095 (9th Cir. 2006).  ERISA provides a uniform regulatory regime over employee-benefit plans and includes expansive preemption provisions which are intended to ensure that employee-benefit-plan regulation would be "exclusively a federal concern."  Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004)(quoting Alessi v. Raybestos–Manhattan, Inc., 451 U.S. 504, 523 (1981)).  There are several civil enforcement provisions under ERISA.  Those provisions can be put into three general categories: (i) those found under section 502, 29 U.S.C. § 1132; (ii) those found under section 409, 29 U.S.C. § 1109; and (iii) miscellaneous provisions found elsewhere in ERISA.  See Carroll v. Los Alamos Nat. Sec., LLC, 704 F. Supp. 2d 1200, 1208-09 (D.N.M. 2010)(Browning, J.).

### 1.     Standard of Review.

In Firestone Tire & Rubber Co. v. Bruch, the Supreme Court of the United States concluded that an administrator's decision to deny benefits is reviewed under a de novo standard unless the

plan provides the administrator with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115. Accord Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 809 (6th Cir. 2002). "In contrast, where a plan does confer discretion upon the administrator to determine eligibility or interpret the terms of the plan, the determinations of the administrator are reviewed under an abuse of discretion standard." Kosakow v. New Rochelle Radiology Assocs., Inc., 274 F.3d 706, 738 (2d Cir. 2001). In de novo review, an ERISA plan defendant "must show that the claimant's interpretation of the Plan is unreasonable." Kosakow v. New Rochelle Radiology Assoc., Inc., 274 F.3d at 738 (citations omitted). The court gives the policy "'its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words,'" Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996)(quoting Blair v. Metro. Life Ins. Co., 974 F.2d 1219, 1221 (10th Cir. 1992)), and construes it "without deferring to either party's interpretation," Firestone, 489 U.S. at 112. Under the de novo standard of review, "the insured carries the burden of showing a covered loss has occurred and the insurer must prove facts that bring a loss within an exclusionary clause of the policy." McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1205 (10th Cir. 1992)(citing M.H. Lipiner & Son, Inc. v. Hanover Ins. Co., 869 F.2d 685, 687 (2d Cir. 1989); Tex. E. Transmission Corp. v. Marine Office-Appleton & Cox Corp., 579 F.2d 561, 564 (10th Cir. 1978)). See Blair v. Metro. Life Ins. Co., 974 F.2d at 1221 ("The insured, Blair, carries the burden of showing a covered loss, and the insurer, MetLife, must prove facts that bring a loss under the exclusionary clause of the policy."). The Court must limit its review to the evidence in the administrative record, unless "circumstances clearly establish that

additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision."

Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1202 (10th Cir. 2002)(citations omitted).

### 2.    **Summary Plan Descriptions and Plan Language.**

Pursuant to 29 U.S.C. § 1022(a):

> A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title.  The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.  A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant.

29 U.S.C. § 1022(a).  Under § 1022(b), the summary plan description must contain "the plan's requirements respecting eligibility for participation and benefits . . . [and] circumstances which may result in disqualification, ineligibility, or denial or loss of benefits . . . ."  29 U.S.C. § 1022(b). If a court reviews plan documents and finds them unambiguous, they may be construed as a matter of law.  See Hickman v. Gem Ins. Co., 299 F.3d 1208, 1212 (10th Cir. 2002).  ERISA plan language is to be given its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean.  See Hickman v. Gem Ins. Co., 299 F.3d at 1212 (quoting Blair v. Metro. Life Ins. Co., 974 F.2d at 1221 (stating that not to give language its ordinary meaning "would thwart the congressional purpose of ERISA's disclosure provisions which are designed to ensure that the individual participant knows exactly where he stands with respect to the plan")(internal quotations omitted).  The presence of ambiguity in a contract term must be determined as a matter of law; an ambiguous contract term is one "reasonably susceptible to more than one interpretation."  Hickman v. Gem Ins. Co., 299 F.3d at 1212 (quoting Carland v. Metro. Life Ins. Co., 935 F.2d 1114, 1120 (10th Cir. 1991))(internal

quotations omitted).  See Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d 98, 107

(2d Cir. 1991)(stating that, in an ERISA case, all ambiguities in a plan must be construed against

the employer).

## LAW REGARDING FIDUCIARIES UNDER ERISA

ERISA provides the following general definition for fiduciaries under the statute:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.  Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A) (§ 3(21)(A) of ERISA).  The Tenth Circuit has explained that, "under

ERISA, an individual 'may acquire fiduciary status' either by (a) being expressly appointed by the

plan as a fiduciary, or (b) by 'exercis[ing] the fiduciary functions set forth in ERISA § 3(21)(A),

29 U.S.C. § 1002(21)(A).'" Holdeman v. Devine, 474 F.3d 770, 777 (10th Cir. 2007)(quoting In

re Luna, 406 F.3d 1192, 1201 (10th Cir. 2005)).  "Once deemed a fiduciary, either by express

designation in the plan documents or the assumption of fiduciary obligations (the functional or de

facto method), the fiduciary becomes subject to ERISA's statutory duties."  In re Luna, 406 F.3d

at 1201.  "These [fiduciary] duties, as summarized by the Supreme Court, 'relate to the proper

management, administration, and investment of fund assets, the maintenance of proper records,

the disclosure of specified information, and the avoidance of conflicts of interest.'"  In re Luna,

406 F.3d at 1201 (quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142-43 (1985)).

The processes for determining whether someone is a fiduciary by express designation in

the plan documents or a de facto fiduciary involve different inquiries:

> Assessing whether a person is a named fiduciary under the terms of a plan
> is, of course, a straightforward inquiry.  Deciding whether a person has assumed
> functional or de facto fiduciary status, however, is a more difficult exercise.  To
> overcome this difficulty, courts frequently interpret the statutory language in
> ERISA § 3(21)(A) by referencing the common law of trusts.

In re Luna, 406 F.3d at 1202.  Courts must also "look to the specific language of ERISA

§ 3(21)(A)" to assess whether a particular entity or individual qualifies as a fiduciary.  In re Luna,

406 F.3d at 1202.  As the Tenth Circuit has explained, the status of an employer as a fiduciary or

non-fiduciary generally poses the most complex inquiry under ERISA:

> This is not to say that the law of trusts provides all the answers.  "Beyond
> the threshold statement of responsibility . . . , the analogy between ERISA fiduciary
> and common law trustee becomes problematic.  This is so because the trustee at
> common law characteristically wears only his fiduciary hat when he takes action to
> affect a beneficiary, whereas the trustee under ERISA may wear different hats."
> Pegram v. Herdrich, 530 U.S. 211, 225 . . . (2000).  Thus, the traditional trustee at
> common law could not assume a position that would place his interests contrary to
> the interests of the trust's beneficiaries.  Id.  Under ERISA, however, an employer
> can "wear different hats," one as employer and one as fiduciary, even though his
> interests as employer may not always align with his interests as fiduciary.  Id.

In re Luna, 406 F.3d at 1202 n.8 (alteration in original).  "ERISA does require, however, that the

fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary

decisions."  Pegram v. Herdrich, 530 U.S. at 225.  Thus, as the Supreme Court has stated:

> In every case charging breach of ERISA fiduciary duty, then, the threshold question
> is not whether the actions of some person employed to provide services under a
> plan adversely affected a plan beneficiary's interest, but whether that person was
> acting as a fiduciary (that is, was performing a fiduciary function) when taking the
> action subject to complaint.

Pegram v. Herdrich, 530 U.S. at 226.

## ANALYSIS

Upon review of the Administrative Record, the Court concludes that Companion Life's

determination that Chandhok was not disabled before his diagnosis on March 15, 2016, is arbitrary

and capricious.  Further, the Policy covered Chandhok on his last day of work.  Companion Life's determination that Chandhok's disability ended on July 5, 2016, is also arbitrary and capricious. Finally, Companion Life's conclusion that there is no support for a mental or nervous impairment is also arbitrary and capricious.  Accordingly, the Court remands to the plan administrator.

I.    **COMPANION LIFE'S CONCLUSION THAT CHANDHOK WAS NOT DISABLED BEFORE MARCH 15, 2016, IS ARBITRARY AND CAPRICIOUS.**

Companion Life first argues in its Motion that Chandhok's "work history negates a claim of disability beginning March 4, 2016," noting that Chandhok worked for two months after his alleged January, 2016, injury.  Motion at 20.  Other courts confronting a similar argument have rejected -- with noted disdain -- insurance companies' contentions that working categorically means that a claimant was not injured.  See Hawkins v. First Union Corp., 326 F.3d 914, 919 (7th Cir. 2003)(Posner, J.)(stating that the insurer made a "bad argument" when it asserted that the claimant was not disabled, because he worked for seven years with fibromyalgia); Radford Tr. v. First Unum Life Ins. Co. of Am., 321 F. Supp. 2d 226, 246 (D. Mass. 2004)(Young, C.J.)("First Unum tried to trap Doe in a Catch-22, arguing that because Doe maintained that he continued to work full time through at least May 21, 1999, he could not have been 'disabled' during that period. This was pure sophistry." (citation omitted)).  Instead, courts have concluded that "there is no 'logical incompatibility between working full time and being disabled from working full time.'" Rochow v. Life Ins. Co. of N. Am., 482 F.3d 860, 865 (6th Cir. 2007)(quoting Hawkins v. First Union Corp., 326 F.3d at 918).  See Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1326 n.6 (11th Cir. 2001)(stating that the court doubted that a claimant's status as a full-time employee constituted reliable evidence that he is able to perform the material duties of his occupation full-times); Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 242 (1st Cir. 2006)("The Plan

essentially asks this court to adopt a legal rule that it is fundamentally inconsistent for an ERISA claimant to be at work and also be sufficiently disabled to support a total and permanent disability claim.  That is not self-evidently true."); Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 392 (3d Cir. 2003); Meyers v. Sheet Metal Workers' Local No. 73 Pension Fund, 181 F. Supp. 3d 479, 488 (N.D. Ill. 2015)(Bucklo, J.); Bray v. Sun Life And Health Ins. Co., 838 F. Supp. 2d 1183, 1197 (D. Colo. 2012)(Jackson, J.).

Companion Life, in its initial denial of Chandhok's claim, states that "[t]he fact you were working for almost 2 months post accident is not consistent with disability."  Scully Letter at 1 (A.R. at 10).  In this case, however, Chandhok's work history has almost nothing to do with whether he was finally too injured to work on one particular day.  Even if it was, Chandhok is claiming disability beginning in March, 2016, not January, 2016.  See Scully Letter at 1 (A.R. at 10).  To the extent that Companion Life relies on the fact that Chandhok worked from January, 2016, until early March, 2016, to conclude that Chandhok was not disabled when he stopped working, its decision was arbitrary and capricious.

One other piece of evidence that Companion Life dismissed should have instead rationally factored into its benefits decision to deny benefits.  Jessica Bosch, the senior clinical consultant who reviewed Chandhok's claim, dismissed Chandhok's contention that his supervisor told him to take time off from work after noticing that he was limping.  See Second Medical Review Form at 6 (A.R. at 288).  Bosch stated that this contention "appears inconsistent with the telephone conversation with the employer on 7/22/16 when the employer stated he was questioning the validity of the claimant's impairment claim."  Second Medical Review Form at 6 (A.R. at 288).

This statement is a strained reading of the Administrative Record.  The Administrative Record reflects that Marc Scully, a Companion Life disability analyst, spoke with Bob Hayes, the Melloy Brothers CFO, on July 22, 2016.  See Marc Scully Notes at 1 (A.R. at 187).  Scully wrote four lines of notes from the call:

> spoke with bob.  confirmed no 401 k deduction.
> got hurt in january and did not report to WC until march, rec'ing WC.
> he has oow notes and will send those.
> he questioned the validity of the claim, i assured him we gather all medical to assess whether or not any claim should be paid. ok.

Marc Scully Notes at 1 (A.R. at 187).  Although Hayes stated that he questioned Chandhok's claim, this statement does not "appear[] inconsistent" with Chandhok's assertion that his general manager[7] sent him home on March 4, 2016, for medical reasons.  Second Medical Review Form at 6 (A.R. at 288).  Scully's notes are short, but it does not appear that Hayes questioned that Chandhok's general manager sent him home -- only whether Chandhok had a valid benefits claim.  These interpretations are different; Hayes could agree that Chandhok was sent home to recover and still believe that he did not have a valid claim.  The Administrative Record, however, sheds no more light on Hayes' reasons for stating that he questions Chandhok's claim.  The "oow notes" mentioned in Scully's report describe how Melloy Brothers' employees processed Chandhok's claim from March, 2016, until June, 2016.  See Melloy Brothers Notes at 1-3 (A.R. at 173-75).  They do not suggest that anyone at Melloy Brothers questioned Chandhok's claim, and they do not provide reasons why they might have questioned the claim.  See Melloy Brothers Notes at 1-3 (A.R. at 173-75).  There is no other information in the Administrative Record providing any details why Hayes disputes the validity of Chandhok's claim.  Nor is there information suggesting

---

[7]Chandhok has asserted that Benson, not Hayes, suggested that he leave that day.  See Reply at 5; Tr. at 56:20-58:4 (Rawley).

Hayes has particular insight into the question such that Companion Life could safely rely on his opinion.

Nevertheless, apparently based only on this line in Scully's notes, Companion Life has suggested that Chandhok lied about his general manager sending him home on March 4, 2016.  In the Motion, Companion Life states that Chandhok "claimed that his general manager saw him limping on his last day of work and suggested that he take time off.  But the employer disputes that this discussion took place and further questioned the validity of the claim."  Motion at 14 (citing First Letter at 3 (A.R. at 280)).  At the hearing, Companion Life told the Court "he's saying [] we didn't investigate whether the person sent him home on March 4.  But we did.  It's in the record.  We cite to it and they disputed his account."  Tr. at 78:4-7 (Bachrach).  Companion Life also incorporated Bosch's opinion into its denial of Chandhok's first and second appeal.  See Second Letter at 2 (A.R. at 722)("[T]his appears inconsistent with the telephone conversation with the employer on July 22, 2016 when the employer stated he was questioning the validity of your client's impairment claim."); First Letter at 3 (A.R. at 280)("[T]his appears inconsistent with the telephone conversation with the employer on July 22, 2016 when the employer stated he was questioning the validity of your client's impairment claim.").  Sandra Kaserman, a senior appeals consultant, wrote these denial letters for Companion Life.  See Second Letter at 3 (A.R. at 722); First Letter at 4 (A.R. at 281).

The Administrative Record supports a different interpretation of Scully's notes.  Although Kaserman handled Chandhok's appeals, Scully handled Chandhok's initial claim.  Despite having spoken to Hayes, Scully based his denial entirely on the fact that, in his opinion, Chandhok was not a full-time employee after March 4, 2016.  See Scully Letter at 2 (A.R. at 11).  Scully did not

challenge Chandhok's injury or say that Melloy Brothers disputed Chandhok's account of his last day.  See Scully Letter at 1-3 (A.R. at 10-12).  In light of this fact, and because it already is unreasonable to rely on Scully's notes to dispute Chandhok's assertion that he was sent home on March 4, 2016, Companion Life acted arbitrarily and capriciously in relying on this evidence to deny Chandhok's claim.

Companion Life cannot solely rely on the fact that Chandhok worked from the date of his injury until March, 2016, to argue that he was not injured in March.  Nor can it rationally dispute evidence from the Administrative Record that Chandhok was sent home on March 4, 2016, because he was limping.  The question becomes, therefore, to what extent Companion Life can rely on the fact that Chandhok did not see a doctor until March 15, 2016, to argue that there is "substantial evidence" Chandhok was not injured on March 4, 2016.  Graham v. Hartford Life & Acc. Ins. Co., 589 F.3d 1345, 1358 (10th Cir. 2009).  In denying Chandhok's appeals, Companion Life heavily relied on Chandhok's lack of medical records, stating:

> To fully understand any associated restrictions and limitations, we need medical records from any providers during a time an insured is claiming disability.  In your client's case, he has reported he had an injury that occurred on January 9, 2016, however, the medical evidence does not support impairment until March 15, 2016.  Since your client was not covered under the plan after March 4, 2016, he is not entitled to disability benefits.

First Letter at 3 (A.R. at 280).  See Second Letter at 2 (A.R. at 722).  The lack of medical records was also an important reason behind Companion Life's initial denial.  See Scully Letter at 2 (A.R. at 11)("Based on the combination of lack of medical records and an approved FMLA . . . as of 3/4/16 we have determined that you would have fallen out of an eligible class as of 3/4/16 and would not have coverage as of 3/15/16 when medical [records] would support disability.").

In briefing, Companion Life appears to concede that the Policy does not require Chandhok to "'prove disability by medical evidence of a doctor visit on the date of disability.'"  Motion at 15 (quoting Brief at 21).  Nevertheless, Companion Life argues later that it is entitled to "objective proof of disability" and that Chandhok cannot provide objective proof "because he sought *no medical treatment* during the relevant time period."  Motion at 16 (emphasis in original).  It also argues that Chandhok "cannot satisfy his burden with self-reported complaints."  Motion at 18.  If self-reporting is insufficient, however, Companion Life requires a claimant seeking to prove disability at any point before a disability diagnosis to have had a previous medical appointment for the same ailment.  This requirement strikes the Court as unreasonably strict.  See Radford Tr. v. First Unum Life Ins. Co. of Am., 321 F. Supp. 2d at 244 (rejecting an insurer's argument that the claimant was first disabled on the date he was diagnosed, because the insurer did not consider the possibility that the claimant was disabled when he made the appointment or before).  Such a requirement allows a disability's onset date to depend on such arbitrary factors as a claimant's aversion to doctor's appointments, his or her access to treatment, and how quickly the particular disability requires its sufferer to seek medical help.  Further, some disabilities can be demonstrated only with self-reporting.   See Chronister v. Baptist Health, 442 F.3d 648, 656 (8th Cir. 2006)("Fibromyalgia is verifiable only through patient self-report."); Perryman v. Provident Life and Accident Ins. Co, 690 F. Supp. 2d 917, 945 (D. Ariz. 2010)(Rosenblatt, J.)(noting that chronic fatigue syndrome is "largely a self-reported illness that cannot be diagnosed through any objective medical test"); Niles v. Am. Airlines, Inc., 563 F. Supp. 2d 1208, 1219 (D. Kan. 2008)(Crow, J.)("In some cases, the claimant's subjective, uncorroborated complaints of pain may constitute the only evidence of the ailment's severity.").

Already questionable in the abstract, the requirement that Chandhok demonstrate his disability with medical records is also not appropriate on these particular facts.  It is true that Chandhok's March 11, 2016, visit to the emergency room does not demonstrate disability, but a rational review of the timeline surrounding Chandhok's alleged injury suggests that these records reasonably cannot form the entire basis for Companion Life's decision.  As discussed above, Companion Life cannot dispute on the Administrative Record that Chandhok's supervisor sent him home because he was limping on March 4, 2016.  Eleven days later, Chandhok told Dr. Pacheco that his right heel pain was a nine out of ten, and Dr. Pacheco diagnosed him with plantar fasciitis and required him to stay out of work for two weeks.  See Dr. Pacheco Treatment Notes at 2-3 (A.R. at 38-39); Letter from Dr. Pacheco at 1 (A.R. at 79).  Three days later, on March 18, 2016, Dr. Garcia diagnosed Chandhok with a bone spur in his right foot, among other conditions, and noted that Chandhok became unable to work since March 4, 2016.  See March 18 Dr. Garcia Notes at 1 (A.R. at 134).  Between Chandhok's last day of work and his appointment with Dr. Pacheco, he was evaluated at the Lovelace Medical Center after displaying stroke symptoms. See Second Medical Review Form at 5 (A.R. at 287).  The medical records from that visit note that Chandhok "has mild tenderness on his left heel that has been going on for a long time" and that his gait is normal.  Lovelace Hospital Treatment Notes at 2 (A.R. at 88).  Where Chandhok's heel problems were not the subject of the emergency room visit and where, under the circumstances, he had little incentive to detail these issues, it is irrational to rely only on these records to assert that Chandhok was not disabled between March 4, 2016, and March 15, 2016.

Companion Life's decision to limit strictly Chandhok's ability to prove an earlier disability is also inconsistent with its role as a fiduciary.  "The burden is on an insurance beneficiary to prove

his or her total disability benefits under an ERISA plan." Miller v. Monumental Life Ins. Co., 761

F. Supp. 2d at 1135 (citing Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 (1st Cir.

2007)).  At the same time, the Tenth Circuit imposes some duty to investigate on ERISA plan

administrators.  See Gaither v. Aetna Life Ins. Co., 394 F.3d at 808 ("An ERISA fiduciary

presented with a claim that a little more evidence may prove valid should seek to get to the truth

of the matter."); Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003)("'[I]f plan

administrators believe that more information is needed to make a reasoned decision, they must ask

for it.'" (quoting Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997))).

See also Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1199-200 (11th Cir. 2010).  But see

McAlister v. Liberty Life Asur. Co. of Bos., 647 F. App'x 539, 549-50 (6th Cir.

2016)(unpublished)(stating that whether a duty to investigate exists is unclear and asserting that

the Gaither v. Aetna Life Ins. Co., rejected the duty to investigate); Truitt v. Unum Life Ins. Co.

of Am., 729 F.3d 497, 510-11 (5th Cir. 2013)(stating that there is no duty to investigate reasonably

claims under ERISA in the United States Court of Appeals for the Fifth Circuit (citing Vega v.

Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 298 (5th Cir. 1999))).  Plan administrators have "a

fiduciary duty to the insured to conduct an investigation and to seek out the information necessary

for a fair and accurate assessment of the claim."  Rasenack ex rel. Tribolet v. AIG Life Ins. Co.,

585 F.3d at 1324.  This standard is reasonable, because, "consistent with ERISA, the claims

process must be collaborative not adversarial, especially in light of the fact that claimants must

often proceed without the aid of legal counsel."  Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15,

24 (4th Cir. 2014)(Wilkinson, J.).  See Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d at

1325.

In Gaither v. Aetna Life Insurance Co., the Tenth Circuit stated that, while insurers need not discover and scour all of the claimant's records, look for other bases to justify disability that the claimant did not raise, or look for more information when the record evidence supports a decision, "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." Gaither v. Aetna Life Ins. Co., 394 F.3d at 807. While "nothing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists," in Gaither v. Aetna Life Insurance Co., given the policy language before the Tenth Circuit, the indications in the record concerning the defendant's medical issues, and the insurer's promise to follow up, "it was arbitrary and capricious for Aetna to dismiss [the plaintiff's claim] for disability without at least attempting to obtain information from Monsanto about the reasons for Mr. Gaither's leave of absence." Gaither v. Aetna Life Ins. Co., 394 F.3d at 804, 806. See Harrison v. Wells Fargo Bank, N.A., 773 F.3d at 24.

As in Gaither v. Aenta Life Insurance Co., the fiduciary has shut its eyes to readily available evidence and denied Chandhok's claim with "little or no evidence" to refute his theory. Gaither v. Aetna Life Ins. Co., 394 F.3d at 807. Chandhok provided Companion Life all the information it needed to verify his story, if it did not believe him.[8] See Marc Scully Review Notes at 1 (dated

---

[8]The Policy's terms require Chandhok to provide evidence of "Proof of Loss." Policy at 32 (A.R. at 216). "Proof of Loss" includes documentation of "a) the date Your disability began; b) the cause of your disability; c) the prognosis of Your Disability; d) Your Pre-disability Earnings, Current Monthly Earnings or any income . . . ; and e) evidence that You are under the Regular Care of a Physician." Policy at 32 (A.R. at 216). "Proof of Loss" also includes "any and all medical information," and the names and addresses of treating physicians, hospitals, and pharmacies. Policy at 32 (A.R. at 216). The Policy states that "[a]ll proof submitted must be

Aug. 30, 2016)(A.R. at 25); Application for Long Term Disability Income Benefits at 1-6 (dated

June 28, 2016)(A.R. at 265-70).  Companion Life called Melloy Brothers to discuss Chandhok's

claim, but it either did not ask about Chandhok's last day of work or it omitted this discussion from

its notes.  See Scully Notes at 1 (A.R. at 187).  If this information was relevant, as its denial of

Chandhok's claims suggests, Companion Life should have asked Melloy Brothers about

Chandhok's last day of work before assuming that Chandhok was not disabled on that date.

Instead, Companion Life's reading of the record implies that Chandhok ceased work in early

March for entirely unknown reasons.  Its arbitrary and capricious misreading of the record requires,

at the very least, remand to properly determine Chandhok's date of disability.  See Hardt v.

Reliance Standard Life Ins. Co., 560 U.S. 242, 252-59 (2010)(describing attorneys fee awards

under ERISA).

## II.    THE POLICY INSURES CHANDHOK BEYOND CHANDHOK'S LAST DAY OF WORK.

Companion Life argues that it correctly denied Chandhok's claim, because there "is no

proof that Plaintiff became disabled from any condition while insured by Companion Life."

Motion at 25.  It asserts that Chandhok  is "not eligible for benefits for any disability that may have

occurred after March 4, 2016," because he was no longer a full-time employee and that he is not

eligible for benefits for disabilities that occurred on or before March 4, 2016, because he did not

prove that he was disabled during this time.  Motion at 23-25.  The Court has explained why

Companion Life's conclusion that Chandhok was not disabled on March 4, 2016, is arbitrary and

---

satisfactory to [Companion Life]," and that Companion Life may require claimants to submit
additional proof of loss.  Policy at 32 (A.R. at 216).  Chandhok provided this information.  See
Application for Long Term Disability Income Benefits at 1-6 (A.R. at 265-70).

capricious.  Companion Life's argument that Chandhok was not covered on March 4, 2016, is therefore invalid.  The only legal question to determine is whether the Policy covers employees such as Chandhok who become disabled after their last full day of work.  If the Policy does not cover employees who are disabled after their last full day of work, Companion Life could deny Chandhok coverage if it concluded that he became disabled after he stopped working.

The Policy states that coverage ends on the earliest of several occurrences, including "the date You cease to be a Full-time Active Employee in an eligible class for any reason."  Policy at 25 (A.R. at 209).  The Policy defines "Active Employee" as "an employee who works for the Employer on a regular basis in the usual course of the Employer's business.  This must be at least the number of hours shown in the Schedule of Insurance."  Policy at 16 (A.R. at 200).  The Policy states that "Full-time employment means the employee must work at least 30 hours per week."  Policy at 14 (A.R. at 198).  It should be noted that the Court is not interpreting the Policy's definition of "Actively at Work" or the Policy's effective date, which in similar situations require employees to be at work to receive coverage.  See, e.g., Thacker v. Schneider Elec. USA, Inc., 547 F. App'x 691, 695 (6th Cir. 2013)(unpublished); Edwards v. Great-West Life Assur. Co., 20 F.3d 748, 749 (7th Cir. 1994); Todd v. Dow Chem. Co., 760 F.2d 192 (8th Cir. 1985).  See also Tr. at 75:25-76:12 (Bachrach).  Nor is this a situation where it was clear that Chandhok would not be coming back to work soon.  See Baker v. Metro. Life Ins. Co., 364 F.3d 624, 627 (5th Cir. 2004)(noting that an employee could not be actively at work after having been on leave for a month and having received a terminal skin cancer diagnosis); Sanford v. Life Ins. Co. of N. Am., 1 F. Supp. 3d 829, 835 (M.D. Tenn. 2014)(Sharp, J.)(stating that it was reasonable to conclude that an employee was no longer in "Active Service" when he had retired and had no plans to return to

work).  Melloy Brothers continued to pay him while he was on leave.  See Paystub at 1 (A.R. at 245).

Chandhok was a full-time employee over this period, because Melloy Brothers had not fired him, and Chandhok was ordinarily scheduled for over forty hours of work per week, even if he did not work in the eleven days prior to his diagnosis.  See Application for Long Term Disability Income Benefits at 9 (A.R. at 273); Dr. Legant Notes at 1 (A.R. at 568).  See Granite v. Guardian Life Ins. Co. of Am., 544 F. Supp. 2d 833, 845-46 (D. Minn. 2008)(Schiltz, J.); Chiodo v. Unum Life Ins. Co. of Am., No. CIV.A. 98-3078, 1998 WL 743596, *3 (E.D. Pa. 1998)(Bartle, J.)("Surely, employees are entitled to take their sick leave, vacations, and holidays without losing their status as full-time workers.").  Whether Chandhok was an "active" employee after March 7, 2016, is less clear from the record and the law.  Several courts have concluded that an employee who is temporarily absent from work is still considered "active."  In Burchett v. Unum Life Insurance Company of America, No. CIV 07-415-JMH, 2009 WL 256561 (E.D. Ky. 2009), the Honorable Joseph Martin Hood, United States District Judge for the Eastern District of Kentucky, concluded that, where an employee was fired from his job while he was on a week's vacation, the employee was still a full-time active employee until he returned to discover he no longer had a job.  See 2009 WL 256561, at *3.  Likewise, in Granite v. Guardian Life Insurance Co. of America, the Honorable Patrick Schiltz, United States District Judge for the District of Minnesota, concluded that a provision terminating coverage on the date "an employee's active full-time service ends for any reason" could not mean that coverage ended once an employee did not work a full week, because then every "employee who goes on vacation or take a couple of sick days would lose coverage."  544 F. Supp. at 848.  See United of Omaha Life Ins. Co. v. Sun Life

Ins. Co. of Am., 894 F. 2d 1555, 1565 (11th Cir. 1990)("[T]he 'active work' requirement cannot

be construed to terminate coverage for employees who are out on short-term sick leave." (citing

Morris v. Mut. Benefit Life Ins. Co., 258 F. Supp. 186, 190 (N.D. Ga. 1966)); Campbell v. Unum

Life Ins. Co., No. Civ.A. 03-1445, 2004 WL 1497712, *14 (E.D. La. 2004)(Fallon, J.)(holding

that employees do not "fall out of 'active employment' when that employee's position is

temporarily modified due to illness, vacation, or other reasons, unless the employee's status

changes").

On the other hand, the Tenth Circuit has previously suggested that absence from work,

even if temporary, means an employee is not "active."   Bartlett v. Martin Marietta Operations

Support, Inc. Life Ins. Plan, 38 F.3d 514, 518 (10th Cir. 1994).   In discussing the differences

between active employment and regular, full-time employment, the Tenth Circuit stated:

> The court is obliged to give terms their plain meaning whenever possible.
> Suppose the decedent in question had been on vacation or had a temporary
> disability, such as a broken leg.  While that employee was under that status the
> employee would not be "active."  We do not believe, however, that such status
> would preclude the employee from still being one of the company's regular full-
> time employees.

Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan, 38 F.3d at 518.  The Tenth

Circuit muddied this conclusion in Weber v. GE Group Life Assurance Co.  As it noted that the

plaintiff regularly worked more than thirty hours a week before her absence from work the Tenth

Circuit rejected the defendant's argument that the plaintiff had lost coverage because she did not

work full time for that month.  It concluded that, based on the policy's definition of "employee"

the case's question was whether the plaintiff had "regularly" worked full time, and it held: "That

illness or vacation might irregularly interrupt an employee's regular assignment does not change

the 'regular' work experience of an employee."  Weber v. GE Grp. Life Assur. Co., 541 F.3d at

1012.  The Tenth Circuit ultimately concluded that it had "little doubt that Mrs. Weber was an active, full-time employee after May 1 despite her sick leave."  Weber v. GE Grp. Life Asur. Co., 541 F.3d at 1014 (emphasis added).

The policy in Weber v. GE Group Life Assurance Co., defined employee as someone who "regularly works at least 30 hours per week at the Employer's usual place of business."  Weber v. GE Grp. Life Assur. Co., 541 F.3d at 1005.  This definition is highly similar to the definition for "Active Employee" in Companion Life's Policy, which is defined as "an employee who works for the Employer on a regular basis in the usual course of the Employer's business.  This must be at least the number of hours shown in the Schedule of Insurance."  Policy at 16 (A.R. at 200).  Given the similarities in these two definitions, the Court will interpret this insurance contract as the Tenth Circuit interpreted the contract in Weber v. GE Group Life Assurance Co.[9]  Because the Tenth Circuit has held that this language does not require a claimant to have worked full-time immediately before asserting coverage, and because the record reflects that Chandhok was on short-term medical leave rather than permanently off work, the Policy covered Chandhok when he was diagnosed as impaired on March 15, 2016.  See Delgrado v. Jefferson Pilot Fin. Ins. Co., Civil Action No. 02-cv-01533-WYD-BND, 2009 WL 279019, *24 (D. Colo. 2009)(Daniel, J)("Like the policies in Weber and Bartlett, the policy at issue contains no language suggesting that 'Active Full-time' work for six months or more requires continuous work 'uninterrupted by periods of absence from work due to the prior disability.'").

_____

[9]Regardless the Tenth Circuit's opinion, the Court also believes that the best interpretation of "Active Employee" in the Policy covers employees such as Chandhok who were temporarily absent from work.  The phrase "on a regular basis" in the definition of "Active Employee" suggests that whether someone is an "Active Employee" depends on a period of time rather than on one moment.

**III.    COMPANION LIFE INSURANCE'S CONCLUSION THAT CHANDHOK'S DISABILITY ENDED ON JULY 5, 2016, IS ARBITRARY AND CAPRICIOUS.**

Chandhok argues that Companion Life's conclusion that his disability ended on July 5, 2016, is arbitrary and capricious.  See Brief at 8.  He asserts that Companion Life "picks a scintilla of evidence of Dr. Legant's release against a tsunami of medical evidence after July 5, 2016, demonstrating he was worse, if no better, after July 5, 2016, than he was during the period from March 15, 2016 to July 5, 2016."  Brief at 8.  He argues that the record does not support denying his claim for disability after July 5, 2016.  See Brief at 26.

In its August 24, 2018, denial letter to Chandhok, Companion Life provides its reasons for why it has concluded that Chandhok was not impaired after July 5, 2016:

>      In regard to the left knee pain, low back pain and upper extremity radicular pain it was noted impairment from light and sedentary level activities is not supported based on the medical information provided.  Your client's reported pain severity does not appear to correlate with the clinical assessments and diagnostics.  Your client's electromyography on April 7, 2016 was within normal limits.  The MRI of his thoracic and cervical spine on March 25, 2016 demonstrated mild findings and his left knee x-ray on April 13, 2016 demonstrate minimal degenerative changes.  His MRI of his lumbar spine on May 25, 2016 also demonstrated mild findings.  His physical assessment in the emergency room on March 11, 2016 demonstrated no neurological abnormalities and a normal gait.  His physical assessment with neurologist Dr. Suter on April 7, 2016[10] demonstrated limping and use of a cane due to his right heel pain however, he had normal strength, muscle tone, sensation, no swelling and no signs of spasticity.  It was concluded that for activities greater than light, it appears reasonable to support impairment through the claimant's work up to his release to return to work without restrictions on July 5, 2016.

Second Letter at 3 (A.R. at 723).  This rationale is an adequate justification for denying Chandhok's claim if the medical evidence ended on July 5, 2016.  Neither this letter nor

---

[10]Although Companion Life states that Chandhok's appointment with Dr. Suter occurred in 2017, the Administrative Record reflects that this appointment occurred in 2016.  See  Dr. Suter Notes at 1 (A.R. at 129).

Companion Life's 2017 denial letter discuss or analyze Chandhok's medical appointments after July 5, 2016.  The record is, however, replete with evidence that Chandhok was still experiencing severe pain after Dr. Legant provided him a note allowing him to return to work.  See Sept. 13 New Mexico Orthopaedics Treatment Notes at 1-2 (dated Sept. 13, 2016)(A.R. at 525-26)(noting that, as of September 13, 2016, although he had improved, Chandhok continued to have heel pain with weightbearing activities and had knee and hip pain as a result of his antalgic gait); Aug. 3 New Mexico Orthopaedics Treatment Notes at 1-2 (dated Aug. 3, 2016)(A.R. at 527-28)(noting mild improvements on August 3, 2016, but that Chandhok has to sit after ten minutes of walking to ease his pain); July 22 New Mexico Orthopaedics Treatment Notes at 1 (A.R. at 529)(noting continued pain with weightbearing activities on July 22, 2016); July 14 New Mexico Orthopaedics Treatment Notes at 1 (A.R. at 531-32)(noting continued moderate to severe pain without improvement on July 14, 2016); Jan. 17 Dr. Legant Notes at 1 (A.R. at 568)(noting that Chandhok reported "severe pain" in his right heel greater than ten out of ten on January 17, 2017); Dec. 22 Dr. Legant Notes at 1 (dated Dec. 22, 2016)(A.R. at 570)(noting Chandhok's December, 2016, complaints that his right heel pain "had become unbearable"); Dr. Kassicieh Treatment Notes at 2 (dated July 20, 2016)(A.R. at 588)(noting that a July 7, 2016 examination "was limited due to pain," and that "patient still needs care and conservative physical therapy to start with and . . . more aggressive invasive care if the conservative approach is not effective"); Dr. Romanik Notes at 1-2 (A.R. at 806-07)(noting that, on April 26, 2018, Chandhok complained about "a tremendous increase in pain," and lay on the floor because he could not get comfortable in a chair); Dr. Romanik Notes at 14 (A.R. at 818)(noting that, as of March 15, 2018, Chandhok complained that he could no longer push his wife's wheelchair); Dr. Romanik Notes at 15 (A.R. at 819)(noting,

as of March 1, 2018, Chandhok's "desperation" for alternative pain treatment); Dr. Haas Notes at 3 (A.R. at 869)(noting, as of October 4, 2017, Chandhok's "continued pain and functional limitations"); Dr. Haas Notes at 5 (A.R. at 871)(noting as of September 1, 2017, Chandhok's continued paid despite physical therapy and injections).  Bosch, Companion Life's medical examiner, summarizes these medical records, but they likewise appear to play no part in her analysis, which focuses entirely on events occurring between Chandhok's initial injury and Dr. Legant's release.  See Third Medica Review Form at 3-4 (A.R. at 727-28); Second Medical Review Form at 6-7 (A.R. at 288-89).[11]  Nevertheless, these records appear to be relevant, as they provide more context for Dr. Legant's conclusion that Chandhok was no longer disabled.

More concerning, however, is the evidence suggesting that Companion Life did not consider Dr. Garcia's opinions before denying Chandhok's disability claim.  The "Restrictions/Limitations per attending physician(s)" section of the Second Medical Review Form includes seven doctor-ordered health restrictions for Chandhok between March 15, 2016, and Dr. Legant's full return to work note on July 5, 2016.  See Second Medical Review Form at 5 (A.R. at 287).  The section does not include any restrictions after Legant's note, even though Dr. Garcia made one such restriction on August 17, 2016.  See Second Medical Review Form at 5 (A.R. at 287).  On that date, Dr. Garcia wrote that it was his "opinion that the patient is not ready to return to work due to ongoing pain and the sedating effects of his current medications."  Aug. 17 Dr. Garcia Notes at 1 (A.R. at 853).

---

[11]Companion Life's factual recitation in its Motion likewise omits any mention of Chandhok's medical appointments after July 5, 2016.  See Motion ¶¶ 40-59, at 8-11.

Bosch's August 8, 2018, evaluation includes two more recent "Restrictions/Limitations": Heiskala's March 7, 2017, statement that he is not qualified to answer whether Chandhok can return to work, and Dr. Haas' March 22, 2018, note that Dr. Haas did not know how long Chandhok had been unable to work but that he could now return to work without restrictions. Third Medical Review Form at 3 (A.R. at 727). Bosch's more recent evaluation, however, does not include Dr. Garcia's restriction that Chandhok not return to work as of August 17, 2016. See Third Medical Review Form at 3-4 (A.R. at 727-28). Kaserman also does not mention Dr. Garcia's note in her denial letters. See First Letter at 1-4 (A.R. at 278-81); Second Letter at 1-3 (A.R. at 721-23). There is, accordingly, no evidence that Companion Life considered, let alone rationally discounted, Dr. Garcia's opinion that Chandhok was disabled after July 5, 2016. This evidence is important. It directly contradicts Companion Life's final conclusion. Not considering this evidence means Companion Life did not make its decision to deny Chandhok employment benefits "on a reasoned basis," and it must evaluate more closely the record. Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).

## IV.   COMPANION LIFE'S CONCLUSION THAT THERE IS NO SUPPORT FOR CHANDHOK'S MENTAL OR NERVOUS IMPAIRMENT IS ARBITRARY AND CAPRICIOUS.

Chandhok also argues that Companion Life's conclusion that he did not have a mental or nervous impairment is arbitrary and capricious. See Brief at 15. Companion Life argues that Chandhok's cited medical records are from a year after he stopped working and provide no support for impairment. See Motion ¶¶ 56-57, at 10-11; id. at 21. It argues that its decision to deny Chandhok's mental impairment claim "is not only reasonable, it is the only possible conclusion that can be reached from the records." Motion at 22.

Bosch summarized the medical records that Chandhok provided for Companion Life's third review, including records from Heiskala and from Dr. Romanik.  See Third Medical Review Form at 1-2 (A.R. at 725-26).  She then discussed whether the evidence supports concluding that Chandhok had a mental impairment:

> **Adjustment disorder with mixed anxiety and depression**: Please note, there is no AP support for mental nervous impairment.  There is a form completed by the claimant's licensed clinical social worker (LCSW) Keven Heiskala dated 03/07/18 for Worker's Comp that indicated the claimant started seeing LCSW Heiskala 01/17/17 for adjustment disorder with mixed emotional features due to his work related injury.  LCSW Heiskala indicated he could not answer if the claimant was able to return to work.  LCSW Heiskala also indicated that the claimant's impairment percentage was not assessed.  The updated provided medical information demonstrates that this claimant had an increase in anxiety and depression in the late fall/early winter of 2016.  On 12/15/16, he presented to his primary care provider Dr. Garcia with passive suicidal ideation.  He was referred to behavioral medicine for further evaluation and treatment.  On 01/06/17, he followed up with Dr. Garcia and reported homicidal ideation towards his boss.  It was noted he was anxious, distressed, angry and talkative during his visit.  It was also noted the claimant stopped taking his prescribed antidepressants and he had been in the emergency room due to his symptoms on 12/30/18.  He was provided with clonazepam.  On 01/17/17 he started seeing LCSW Heiskala.  Since then, the claimant has had several counseling sessions, which appear to occur biweekly to monthly.  On 02/15/18, the claimant started seeing psychiatrist Dr. Romanik.  He underwent medication changes on 02/15/18 and 03/15/18.

Third Medical Review Form at 3-4 (A.R. at 727-28).  Kaserman, in her letter to Chandhok denying his claim, copied Bosch's analysis with minor formatting changes and added that "[i]t was concluded there is no provider supporting impairment due to mental nervous condition."  Second Letter at 2 (A.R. at 722).

The basis for Companion Life's decision is difficult to understand.  Companion Life may be stating Chandhok has no attending physician support for a mental nervous impairment, because Heiskala is a licensed clinical social worker and not a doctor.  Adequate "Proof of Loss" under the Policy requires "evidence that You are under the Regular Care of a Physician."  Policy at 32 (A.R.

at 216).  While Heiskala does not have a medical degree, however, his services appear to be the

that of a "Physician" as the policy defines that term.  Policy at 32 (A.R. at 216).  The Policy defines

"Physician" as "a doctor of medicine, osteopathy, psychology, or other legally qualified

practitioner of a healing art that We recognize or are required by law to recognize."  Policy at 20

(A.R. at 204).

"[O]ther legally qualified practitioner of a healing art" encompasses licensed clinical social

workers.  The Tenth Circuit, in an unpublished opinion, has stated that a New Mexico claimant's

licensed clinical social worker was a physician when that word was defined as "any licensed

practitioner of the healing arts practicing within the scope of his or her license."  Sipp v.

Unumprovident Corp., 107 F. App'x 867, 874 (10th Cir. 2004).  The Tenth Circuit stated that this

definition "would include certain licensed social workers, counselors, and psychologists, who are

trained in dealing with depression and other mental disorders."  Sipp v. Unumprovident Corp., 107

F. App'x at 874.  See Jacobs v. Unum Life Ins. Co. of Am., No. 3:04CV1034, 2006 WL 435845,

*2 (M.D. Tenn. 2006)(Wiseman, J.)(noting that Unum Life Insurance had a licensed clinical social

worker review files to determine whether a claimant was disabled).  Couch on Insurance,

meanwhile, states that "courts, in determining what constitutes a qualified or legally licensed

physician or surgeon within the meaning of a policy, usually consult local statutory law."

"Qualified Physician or Surgeon," 10A Steve Plitt, et al., Couch on Ins. § 146:35 (3d ed. 2020).

New Mexico's statutes suggest that the state considers a licensed clinical social worker to be a

"legally qualified practitioner of a healing art."  Policy at 20 (A.R. at 204).  The state defines

"clinical social work practice" as "the professional application of social work theory and methods

in the diagnosis, treatment and prevention of psychosocial dysfunction, disability or impairment,

including but not limited to emotional and mental disorders." N.M. Stat. Ann. § 61-31-6. In light

of the Tenth Circuit's unpublished opinion and New Mexico's clinical social worker definition,

Companion Life must state clearly if it does not "recognize" Heiskala as a "Physician." Policy at

20 (A.R. at 204). See Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003)("'If

benefits are denied . . . the reason for the denial must be stated in reasonably clear language.'"

(quoting Booton v. Lockheed Med. Benefit Plan, 110 F.3d at 1463)).

If Companion Life accepts Heiskala as a "Physician," it is unclear why it concludes that

Chandhok did not have a mental impairment. Bosch's analysis and Kaserman's letter state a

conclusion -- that there is no attending physician support for impairment -- and then summarize

Chandhok's medical records. See Second Letter at 2 (A.R. at 722); Third Medical Review Form

at 3-4 (A.R. at 727-28). There is no reasoning that links the records to Companion Life's

conclusion. It is not clear, for example, if Heiskala's diagnosis of adjustment disorder is

insufficiently impairing, or whether Chandhok's diagnoses and treatment were too far removed

from his last day of work to constitute compensable impairment. Although it forms a part of

Companion Life's analysis, it is also not clear how much Companion Life relied on Heiskala's

March 7, 2017, worker's compensation letter in which he indicated that he could not answer

whether Chandhok could return to work. See Form Letter to Health Care Provider from the New

Mexico Workers' Compensation Administration at 1 (dated March 13, 2017)(A.R. at 913).[12]

Without any reasoning to analyze, the Court cannot uphold Companion Life's decision on

---

[12]This evidence is not relevant. Heiskala stated during his deposition that whether his patients are able to work is "beyond the scope of my practice" and that he is unable to "assert[] an opinion on [Chandhok's] ability to work." Deposition of Kevin Heiskala at 29:7, 49:18 (taken March 20, 2018)(A.R. at 742, 747).

arbitrary-and-capricious review.  Although the decision may have been reasonable, Companion Life's statements for why it rejected Chandhok's mental impairment claim do not represent "a reasoned basis."  Adamson v. Unum Life Ins. Co. of Am., 455 F.3d at 1212.

**IT IS ORDERED** that: (i) the Motion for Summary Judgment, filed January 10, 2020 (Doc. 22), is denied; and (ii) the case is remanded to Defendant Companion Life Insurance Company to determine Plaintiff Paul Chandhok's impairment date, to reconsider its conclusion that Chandhok was not impaired on July 5, 2016, in light of Dr. Michael Garcia's August, 2016, comments, and to provide an explanation for its decision to deny Chandhok's mental impairment claim.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James A. Rawley
Albuquerque, New Mexico

 *Attorney for the Plaintiff*

Scott Sweeney
Joshua Bachrach
Wilson Elser Moskowitz Edelman & Dicker, LLP
Denver, Colorado

 *Attorneys for the Defendant*

- 58 -