**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

PAUL CHANDHOK,

       Plaintiff,

vs.                                                                   No. CIV 19-0362 JB/JFR

COMPANION LIFE INSURANCE
COMPANY,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Motion to Alter or Amend Judgment, filed September 4, 2020 (Doc. 31)("Motion").  The Court held a hearing on October 5, 2020.  <u>See</u> Clerk's Minutes at 1, filed Sept. 29, 2020 (Doc. 36).  The primary issue is whether the Court misapprehended the facts or Defendant Companion Life Insurance Company's ("Companion Life") position in reaching the conclusion that Companion Life's determination that Plaintiff Paul Chandhok's disability ended on July 5, 2016, was arbitrary and capricious, and thus, under rule 59 of the Federal Rules of Civil Procedure, whether the Court should amend its conclusion in its Memorandum Opinion and Order, <u>Chandhok v. Companion Life Ins. Co.</u>, 478 F. Supp. 3d 1157 (D.N.M. 2020)(Browning, J.), filed August 13, 2020 (Doc. 30)("MOO").  Specifically, the issue is whether the Court misapprehended Companion Life's interpretation of when policy coverage terminates, and thus, what medical evidence is appropriate to consider when considering an Employee Retirement Income Security Act (ERISA) benefits appeal.  <u>See</u> Motion at 4-5.  The Court concludes that Companion Life's Motion only raises arguments and presents evidence that could have been raised before judgment, and thus, is rearguing an issue the Court addressed previously.  Specifically, the Court concludes that Companion Life's policy interpretation

argument does not raise any new argument or present new evidence that was not available before the entry of final judgment.  The Court, therefore, declines to alter or amend the MOO and denies the Motion.

## FACTUAL BACKGROUND

As it has done in the past, the Court recites the factual background as stated in its MOO, as neither party has objected to the Court's recitation of facts in the MOO.  The footnotes associated with the quoted text are also quoted in full from the MOO.  See MOO, 478 F. Supp. 3d at 1161-65.

> Companion Life issued the Group Long Term Disability Policy ("Policy") to Melloy Brothers Enterprises, an Albuquerque, New Mexico-based car dealership.  See Memorandum of Law in Support of Companion Insurance Company's Motion for Summary Judgment ¶ 1, at 2, filed January 10, 2020 (Doc. 22-1)("Memo.")(citing Group Long Term Disability Insurance Policy (undated), in the Administrative Record at 188-219, filed February 6, 2020 (Doc. 27)("A.R.")).  The Policy covers "[a]ll Full-time Active Employees. . . . Full-time employment means the employee must work at least 30 hours per week."  See Memo. ¶ 2, at 2 (citing Policy at 14, 23 (A.R. at 198, 207)).  Chandhok was an Assistant Sales Manager at Melloy Brothers Enterprises, Inc., an Albuquerque, New Mexico-based car dealership.  See Appellant's Brief in Chief at 5, filed January 3, 2020 (Doc. 21)("Brief"); Application for Group Life, AD&D (undated)(A.R. at 220); Notification of Appeal (Aug. 25, 2017)(A.R. at 1408).  As part of his job, Chandhok first became insured under the Policy on June 1, 2015.  See Memo. ¶ 3, at 2 (citing Application for Long Term Disability Income Benefits at 1 (dated June 23, 2016)(A.R. at 2742)("Application")).  His last day of work at Melloy Brothers was March 4, 2016.  See Memo. ¶ 4, at 2 (citing Application at 4 (A.R. at 2745)).  Chandhok claimed disability on March 5, 2016.  See Memo. ¶ 4, at 2 (Application at 4 (A.R. at 2745)).
>
> The Policy states that disability benefits are payable when the insureds: "'(1) become Disabled while insured under The Policy; (2) are Disabled through the Elimination Period; (3) remain Disabled beyond the Elimination Period; and (4) submit Proof of Loss to Us.'"  Memo. ¶ 5, at 2-3 (quoting Policy at 27 (A.R. at 211)).  One of the requirements of proving disability under the Policy is that the insured is unable to perform "'one or more of the Essential Duties of . . . Your Occupation for the 24 months following the Elimination period, and as a result Your Current Monthly Earnings are less than 80% of Your indexed Pre-disability Earnings.'"  Memo. ¶ 6, at 3 (quoting Policy at 17 (A.R. at 201)).  To cover a disability, the Policy requires that the disability result from "'accidental bodily injury,'" "'Sickness,'" "'Mental Illness,'" "'Substance Abuse,'" or "'pregnancy.'"

Memo. ¶ 7, at 3 (quoting Policy at 17 (A.R. at 201)). The Policy terminates coverage on the earliest of

> the date The Policy terminates; the date The Policy no longer insures Your class; the date premium payment is due but not paid by the Employer; the last day of the period for which You make any required premium contribution; the last day of the month or on next following the month in which Your Employer terminates Your employment; the date You cease to be a Full-time Active Employee in an eligible class for any reason; unless coverage is extended under the Continuation Provisions.

Memo. ¶ 8, at 3-4 (quoting Policy at 25 (A.R. at 209)). On June 24, 2015, months before Chandhok's asserted injury, Dr. Michael Garcia, Chandhok's primary care physician, examined Chandhok and found "'no particular injury but several months of medial left knee pain.'" Brief at 10 (quoting Dr. Garcia Notes at 3 (dated June 24, 2015)(A.R. at 825)).

Chandhok says that he injured himself on January 9, 2016, when he caught his right heel in a pothole and fell on his left knee. See Memo. ¶ 9, at 4 (citing Application at 4 (A.R. at 2745)); First Medical Review Form at 2 (dated Sept. 15, 2016)(A.R. at 2553). After this incident, he experienced "severe pain in left side of body (tip of toe), right heel spur & left knee bruised and causing pain to lower back/leg/heel/spine." Memo. ¶ 10, at 4 (citing Application at 3 (A.R. at 2744)). Chandhok worked full time between his fall and March 4, 2016, and did not seek medical attention until one week after he stopped working. See Memo. ¶ 13, at 4 (citing Application at 4 (A.R. at 2745)). Chandhok said on his application for disability benefits that, because seventy to ninety percent of his job requires walking, his job is impossible to do with an injured knee and bruised heel. See Memo. ¶ 11, at 4 (citing Application at 4 (A.R. at 2745)). Chandhok has stated that his general manager saw him walking with a limp and suggested that he take time off work. See Memo. ¶ 14, at 5 (citing First Letter from Sanda Kaserman to James Rawley at 3 (dated Aug. 25, 2017)(A.R. at 280)("First Letter")). A manager at Melloy Brothers questioned the validity of Chandhok's disability claim. See Memo. ¶ 14, at 5 (citing First Letter at 3 (A.R. at 280)); Marc Scully Notes at 1 (dated July 22, 2016)(A.R. at 187).

On March 10, 2016, Chandhok underwent a CT Scan after complaining about weakness and numbness in his extremities lasting three days. See Memo. ¶ 15, at 5 (citing Notes from Lovelace Hospital at 15, 18 (dated July 27, 2017)(A.R. at 455, 458)). The resulting preliminary radiological report noted that the results were unremarkable. See Memo. ¶ 15, at 5 (citing Notes from Lovelace Hospital at 15 (A.R. at 455)). The next day, on March 11, 2016, Chandhok went to an Emergency Room for numbness in his left arm, shoulder, and leg. See Memo. ¶ 16, at 5 (citing Lovelace Hospital Treatment Notes at 1-5 (A.R. at 85-89)); Brief at 11. He reported then that his symptoms started one week earlier and "'start randomly [and] go away randomly.'" Memo. ¶ 17, at 5 (quoting Lovelace Hospital Treatment

Notes at 3 (A.R. at 87))(alteration in Memo.).  The ER physician thought that Chandhok's symptoms were "'most likely neuropathy[1] that could be due to cervical root impingement or elbow impingement of the nerve by the way that that the patient describes,'" but "'a transient ischemic attack[2] is also in the differential,'" and he recommended an MRI.[3]  Memo. ¶ 18, at 5 (quoting Lovelace Hospital Treatment Notes at 4 (A.R. at 88)).  The ER records document Chandhok's hypertension history, but his blood pressure was normal on that day.  See Memo. ¶ 19, at 5 (citing Lovelace Hospital Treatment Notes at 4 (A.R. at 88)). Chandhok declined an MRI, because he is claustrophobic.  See Memo. ¶ 20, at 5 (citing Lovelace Hospital Treatment Notes at 1 (A.R. at 85)).  He also declined overnight admission at the hospital.  See Memo. ¶ 21, at 5 (citing Lovelace Hospital Treatment Notes at 1, 5 (A.R. at 85, 89)).

Chandhok consulted with Dr. Floyd Pacheco, a podiatry specialist at New Mexico Orthopedics, on March 15, 2016, for right foot pain.  See Memo. ¶ 22, at 6 (citing Dr. Pacheco Treatment Notes at 1-3 (dated August 19, 2016)(A.R. at 37-39); Lovelace Hospital Treatment Notes at 2 (A.R. at 86)); Brief at 12.  Chandhok told Dr. Pacheco that his symptoms started three weeks earlier but that he did not recall a specific injury causing his pain.  See Memo. ¶ 23, at 6 (citing Dr. Pacheco Treatment Notes at 1 (A.R. at 37)).  Chandhok described his pain as aching and severe, said his pain level was a nine out of ten, and said that his pain is worst when standing and walking.  See Brief at 12; Dr. Pacheco Treatment Notes at 1 (A.R. at 37).  Chandhok told Dr. Pacheco that he walks long hours at work.  See Brief at 12; Dr. Pacheco Treatment Notes at 1 (A.R. at 37).  Dr. Pacheco diagnosed Chandhok

---

[1]Peripheral neuropathy is a result of nerve damage outside the brain and spinal cord and results in numbness and pain in extremities.  See "Peripheral Neuropathy," The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last accessed August 4, 2020).

[2]A transient ischemic attack is a "temporary period of symptoms similar to those of a stroke," which lasts only a few minutes and does not cause permanent damage.  "Transient Ischemic Attack," The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last accessed August 4, 2020).

[3]MRI stands for magnetic resonance imaging.  See "MRI," The Mayo Clinic, https://www.mayoclinic.org/tests-procedures/mri/about/pac-20384768 (last accessed August 4, 2020)("Mayo MRI").  Patients lie inside large, tube-shaped machines which use a magnetic field to create the MRI images.  See Mayo MRI. MRIs last up to an hour, as opposed to CT scans, which take only ten minutes.  See "MRI vs. CT Scan," Health Images, https://www.healthimages.com/mri-vs-ct-scan/ (last accessed August 4, 2020).

with plantar fasciitis[ 4 ] and injected his right tendon sheath with medication. See Memo. ¶ 24, at 6 (citing Dr. Pacheco Treatment Notes at 2-3 (A.R. at 38-39)); Brief at 12. Dr. Pacheco instructed Chandhok not to work for two weeks. See Memo. ¶ 25, at 6 (citing Letter from Dr. Pacheco at 1 (dated March 15, 2016)(A.R. at 179)).

On March 18, 2016, Dr. Garcia examined Chandhok. See Memo. ¶ 27, at 6 (citing March 18 Dr. Garcia Notes at 1-5 (dated March 18, 2016)(A.R. at 134-38)). Dr. Garcia noted, among other results, "'[s]ensation both hands and feet intact to monofilament. Pulses intact both wrists and feet. No atrophy.'" Memo. ¶ 29, at 6 (quoting March 18 Dr. Garcia Notes at 5 (A.R. at 138)). He also noted heel pain from a bone spur. See Brief at 10; March 18 Dr. Garcia Notes at 1 (A.R. at 134).

Chandhok saw a neurologist on April 7, 2016. See Memo. ¶ 33, at 7 (citing Dr. Suter Notes at 1-5 (dated April 7, 2016)(A.R. at 129-33)). Dr. Cary Suter evaluated Chandhok for left arm and left leg numbness. See Memo. ¶ 34, at 7 (citing Dr. Suter Notes at 1-5 (A.R. at 129-33)). Dr. Suter stated that Chandhok was limping and using a cane because of his heel spur, but he noted that Chandhok was otherwise able to walk "'normally with no signs of ataxia'" and that "'[b]oth the left upper and lower extremities show normal muscle bulk with no evidence for atrophy. Muscle tone is normal there are no signs of spasticity.'" Memo. ¶ 35, at 7 (quoting Dr. Suter Notes at 4 (A.R. at 132)). Dr. Suter further noted that "'[r]reflexes are 1 -- and symmetric in all 4 extremities and there are no pathologic reflexes. He has normal strength, 5/5, both proximal and distal. He has intact sensation to all modalities.'" Memo. ¶ 36, at 8 (quoting Dr. Suter Notes at 4 (A.R. at 132)).

Dr. Garcia saw Chandhok again on April 13, 2016, and he noted that an MRI report showed protruding disks and planned to refer him for a cervical epidural. See Brief at 10; April 13 Dr. Garcia Notes at 1 (dated April 13, 2016)(A.R. at 125). On June 20, 2016, Dr. Garcia saw Chandhok again and noted minimal swelling in his left knee. See Brief at 10; June 20 Dr. Garcia Notes at 1 (dated June 20, 2016)(A.R. at 116). Later, on June 28, 2016, Dr. Garcia completed the Attending Physician Statement on Chandhok's disability benefit application. See Memo. ¶ 27, at 6 (citing Application at 8-9 (A.R. at 2749-50)). Dr. Garcia stated at that time that Chandhok's condition had an "onset date" of January 9, 2016, and a "'paper filing'" date of March 10, 2016. Memo.¶ 30, at 7 (quoting Application at 8 (A.R. at 2749)). Dr. Garcia did not explain the distinction between these two dates. See Memo. ¶ 31, at 7 (citing Application at 8 (A.R. at 2749-50)). Dr. Garcia wrote that Chandhok was still disabled and unable to work. See Memo. ¶ 37, at 12 (citing June 28 Dr. Garcia Notes at 1 (dated June 28, 2016)(A.R. at 109)). He also prescribed Chandhok an anti-depressant. See Brief

---

[4]Plantar fasciitis is an "inflammation of the plantar fascia, most usually non-infectious, and often caused by an overuse mechanism; elicits foot and heel pain." Plantar fasciitis, Stedman's Medical Dictionary (2014).

at 10; June 28 Dr. Garcia Notes at 2 (A.R. at 110).   Dr. Garcia strongly recommended that Chandhok receive specialty care.  See Memo. ¶ 37, at 12 (citing June 28 Dr. Garcia Notes at 1 (A.R. at 109)).

Chandhok, accordingly, went to Dr. Paul Legant, an orthopedic surgeon in Albuquerque, for an independent medical exam.  See Memo. ¶¶ 37-39 (citing July 5 Dr. Legant Notes at 1-7 (dated July 5, 2016)(A.R. at 560-66); Medical Certificate for Return to Work at 1 (dated July 5, 2016)(A.R. at 666)).  Dr. Legant evaluated Chandhok on July 5, 2016.  See Memo. ¶ 39, at 8 (citing June 5 Dr. Legant Notes at 1-7; Medical Certificate for Return to Work at 1).  He prepared a report "'from the orthopedic and neurologic standpoint[, referencing Chandok's] spine upper and lower extremities.'"  Memo. ¶ 39, at 8 (June 5 Dr. Legant Notes at 7).  Dr. Legant gave Chandhok a one percent permanent impairment for his right foot and ankle based on his plantar fasciitis.  See Brief at 13 (citing Dr. Legant Treatment Notes at 1 (dated July 26, 2016)(A.R. at 572)).  Dr. Legant provided Chandhok a note allowing him to return to work without limitations.  See Memo. ¶ 39, at 8 (citing June 5 Dr. Legant Notes at 1 (A.R. at 566)).  Chandhok's physical therapy reports from this time period note his difficulties walking, his pain after walking more than ten minutes, and his antalgic[5] gait.  See Brief at 12; Records from New Mexico Orthopedics at 1-4 (dated August 19, 2016)(A.R. at 30-33).

Companion Life reviewed Chandhok's claim for disability on September 15, 2016 and concluded that the only condition supporting impairment was his plantar fasciitis diagnosis.  Memo. ¶ 41, at 8 (citing Medical Review Form at 5 (A.R. at 2556)).  Companion Life further concluded:

> The claimant is reporting multiple symptoms which include knee pain, neck pain and low back pain that date back to a work-related injury in January 2016; however, he continued to work up until March 4, 2016.  Please refer to the analysis for more detail. The fact that the claimant was able to work for two months with these symptoms, does not support impairment.  In addition, when he first presented to Dr. Garcia on 3/18/16, there was no mention of knee pain or electric shock type pain on top of the head.  It is not clear when these symptoms actually first appeared and how they are impacting function.

Memo. ¶ 41, at 8 (citing Medical Review Form at 5 (A.R. at 2556)).  Companion Life denied Chandhok's claim on September 21, 2016.  See Memo. ¶ 42, at 9 (citing Letter from Marc Scully to Paul Chandhok at 1-3 (dated Sept. 21, 2016)(A.R.

---

[5] Antalgic is defined as "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)."  Meriam-Webster Dictionary, "Antalgic," https://www.merriam-webster.com/medical/antalgic (last accessed August 8, 2020).

at 10-12)("Scully Letter")).  Chandhok appealed the decision on February 22, 2016.  See Memo. ¶ 43, at 9 (citing Letter from Paul Chandhok to Marc Scully at 1 (dated Feb. 22, 2017)(A.R. at 2)).  Chandhok argued in the appeal that he had "'severe difficulty from my head to my leg, and under this stress, depression also.'" Memo. ¶ 44, at 9 (quoting Letter from Paul Chandhok to Marc Scully at 1 (A.R. at 2)).  On January 17, 2017, Chandhok met with Kevin Heiskala, a clinical social worker, who evaluated Chandhok's mental health.  See Brief at 9 (citing Heiskala Notes at 1-13 (dated Jan. 17, 2017)(A.R. at 751-763)).

On August 9, 2016, Dr. Garcia examined Chandhok and noted a minimally swollen left knee.  See Brief at 10; Aug. 9 Dr. Garcia Notes at 4 (dated Aug. 9, 2016)(A.R. at 852).  On August 17, 2016, Dr. Garcia dictated a letter stating his opinion that Chandhok was not ready to return to work because of ongoing pain and the sedating effect of his current medication.  See Brief at 10; Aug. 17 Dr. Garcia Notes at 5 (dated Aug. 17, 2016)(A.R. at 853).  On December 15, 2016, Dr. Garcia noted that Chandhok had a tender right heel, and severe anxiety and depression.  See Brief at 10; Dec. 15 Dr. Garcia Notes at 1-4 (dated Dec. 15, 2016)(A.R. at 856-59).  On January 6, 2017, Dr. Garcia wrote that he was "very concerned" about Chandhok's mental state.  Brief at 10 (citing January 6 Dr. Garcia Notes at 1 (dated June 6, 2017)(A.R. at 860)).  On January 17, 2017, Dr. Legant wrote that he thought "'it would be fine to see his podiatrist for further care of his right foot and heel.'" Brief at 13 (quoting Jan. 17 Dr. Legant Notes at 1 (dated Jan. 17, 2017)(A.R. at 568)).

Companion Life reviewed Chandhok's file again on August 4, 2017.  See Memo. ¶ 46, at 9 (citing Second Medical Review Form at 1-7 (dated Aug. 4, 2017)(A.R. at 283-89)).  It concluded, again, that only plantar fasciitis impaired Chandhok from March 15, 2016, until July 5, 2016.  See Memo. ¶ 47, at 9 (citing Second Medical Review Form at 1-7 (A.R. at 283-89)).  It also concluded that the medical information provided does not support impairment preventing Chandhok from performing light and sedentary activities:

> The claimant's reported pain severity does not appear to correlate with the clinical assessments and diagnostics.  The claimant's electromyography[6] on 04/07/16 was within normal limits.  The MRI of his thoracic and cervical spine on 03/25/16 demonstrated mild findings.  The x-ray of his left knee on 04/13/16 demonstrated minimal degenerative changes.  His MRI of his lumbar spine on 05/25/16 also demonstrated mild findings.  His physical assessment in the emergency room on 03/11/16 demonstrated no neurological abnormalities and a normal gait.  His physical assessment with neurologist Dr. Suter on 04/07/17 demonstrated limping and use of a cane due to his right heel pain

---

[6] Defined as "the recording of electrical activity generated in muscle for diagnostic purposes."  Electromyography, Stedman's Medical Dictionary (2014).

> however, he had normal strength, muscle tone, sensation, no
> swelling, and no signs of spasticity.

Memo. ¶ 48, at 9 (quoting Second Medical Review Form at 6 (A.R. at 288)).
Companion Life denied Chandhok's appeal on August 25, 2017.  See Memo. ¶ 49,
at 9 (citing First Letter at 1-4 (dated Aug. 25, 2017)(A.R. at 968-71)).

Chandhok began to see Dr. Zachary Haas, a podiatrist at Albuquerque
Associated Podiatrists, in September, 2017.  See Brief at 10-11 (citing Dr. Haas
Notes (dated March 22, 2017)(A.R. at 867-75)).  On February 15, 2018, Dr. Ronald
Romanik, an Albuquerque-based psychiatrist, performed a psychiatric evaluation
of Chandhok.  See Brief at 9 (citing Dr. Romanik Notes at 1-17 (A.R. at 806-822)).
Dr. Romanik saw Chandhok again on March 1, 2018, March 15, 2018, April 17,
2018, and April 26, 2018.  See Brief at 9 (citing Dr. Romanik Notes at 1-17 (A.R.
at 806-822)).  On April 26, Dr. Romanik noted Chandhok "has developed a mixed
presentation of depression and hypomania[7]," and Dr. Romanik discussed the
possibility of hospitalization if his condition did not improve.  See Brief at 9 (citing
Dr. Romanik Notes at 3 (A.R. at 808)).

Chandhok appealed Companion Life's denial of disability benefits again in
early 2018, and he supplied additional medical records, including those relating to
his psychiatric treatment.  See Memo. ¶ 50, at 10 (citing Letter from James Rawley
to Sandra Kaserman (dated July 3, 2018)(A.R. at 734)).  Companion Life reviewed
Chandhok's claim again on August 8, 2018.  See Memo. ¶¶ 51-52, at 10 (citing
Third Medical Review Form at 1-5 (dated Aug. 8, 2018)(A.R. at 1853-57)).  It did
not change its assessment of Chandhok's plantar fasciitis, left knee pain, lower back
pain, and left upper extremity radicular pain.  See Memo. ¶ 53, at 10 (citing Third
Medical Review Form at 4 (A.R. at 1856)).  Companion Life reviewed records
relating to Chandhok's adjustment disorder, anxiety, and depression.  See Memo.
¶ 54, at 10 (citing Third Medical Review Form at 3 (A.R. at 1855)). These records
are dated nearly a year after Chandhok's last day of work, and Companion Life
concluded that they did not support impairment.  See Memo. ¶ 55-56, at 10; Third
Medical Review Form at 1-5 (A.R. at 1853-57).

Companion Life denied Chandhok's appeal on August 24,
2018.  See Memo. ¶ 57, at 11 (citing Second Letter from Sandra Kaserman to James
Rawley at 1-3 (dated Aug. 24, 2018)(A.R. at 721-23)("Second Letter")).
Companion Life's denial letter recites a policy provision: "'Your coverage will end
on the earliest of the following . . . the last day of the month on or next following
the month in which your employer terminates your employment.'"  Brief at 15
(quoting Second Letter at 1 (A.R. at 721)).  It notes that, because Chandhok was
not covered under the Policy after March 4, 2016, he is not entitled to disability
benefits.  See Brief at 15 (citing Second Letter at 3 (A.R. at 723)).  Companion Life

---

[7]Hypomania is "a mild degree of mania."  Hypomania, Stedman's Medical Dictionary
(2014).

also stated that the medical evidence did not support impairment until March 15, 2016.  See Brief at 13 (citing Second Letter at 3 (A.R. at 723)).

MOO, 478 F. Supp. 3d at 1161-65.

## PROCEDURAL BACKGROUND

Chandhok filed his complaint on February 28, 2019, in State court.  See Complaint for ERISA Plan Benefits, filed in Second Judicial District Court, County of Bernalillo, State of New Mexico, filed in federal court April 19, 2019 (Doc. 1-1)("Complaint").  In the Complaint, Chandhok brought claims seeking payment of short and long-term benefits under an ERISA plan.  See Complaint at 4-5.  Companion Life removed this case to the United States District Court for the District of New Mexico on April 19, 2019.  See Notice of Removal, filed April 19, 2019 (Doc. 1).  Chandhok filed an Appeal from the Denial of Companion Life Under ERISA, filed January 3, 2020 (Doc. 21)("ERISA Appeal").  Companion Life then filed its Motion for Summary Judgment, filed January 10, 2020 (Doc. 22)("MSJ").

### 1.    The MOO.

On August 13, 2020, the Court filed its MOO, disposing of the ERISA Appeal and the MSJ, and explains that this action involves claims that Companion Life had arbitrarily and capriciously reached conclusions regarding Chandhok's disability claims, including: (i) that Chandhok was not disabled before his diagnosis; (ii) that Chandhok was not insured beyond his last day at work; (iii) that Chandhok's disability ended on July 5, 2016; and (iv) that Chandhok did not have a mental or nervous impairment.  See MOO, 478 F. Supp. 3d at 1159; Complaint at 3-5.  In its MOO, the Court concludes: (i) that Companion Life's conclusion that Chandhok was not disabled before his March 15, 2016, diagnosis was arbitrary and capricious; (ii) that Chandhok's policy extended beyond his last day at work; (iii) that Companion Life's conclusion that Chandhok's disability ended on July 5, 2016, was arbitrary and capricious; and (iv) that Companion Life's conclusion

that he did not suffer from a mental or nervous impairment was arbitrary and capricious.  See MOO, 478 F. Supp. 3d at 1159-60.

The Court concluded that Companion Life's determination that Chandhok's disability ended on July 5, 2016, was arbitrary and capricious because it did not consider conflicting evidence. Companion Life considered medical records from March 15, 2016, up to Dr. Paul Legant's July 5, 2016, medical evaluation of Chandhok, which cleared Chandhok to return to work without restriction, to reach the conclusion that Chandhok's disability had ended on July 5, 2016.  See MOO, 478 F. Supp. 3d at 1187.  The Court noted:

> This rationale is an adequate justification for denying Chandhok's claim if the medical evidence ended on July 5, 2016.  Neither [an August 24, 2018, denial letter to Chandhok] nor Companion Life's 2017 denial letter discuss or analyze Chandhok's medical appointments after July 5, 2016.  The record is, however, replete with evidence that Chandhok was still experiencing severe pain after Dr. Legant provided him a note allowing him to return to work.

MOO, 478 F. Supp. 3d at 1187.  Companion Life summarized the later medical records, "but they likewise appear to play no part in [the] analysis, which focuses entirely on events occurring between Chandhok's initial injury and Dr. Legant's release."  MOO, 478 F. Supp. 3d at 1188.  The Court concluded that these later medical records add relevant context that complicates Companion Life's reliance on Dr. Legant's July 5, 2016, opinion to reach the conclusion that Chandhok's disability had ended.  See MOO, 478 F. Supp. 3d at 1188.

The Court was concerned that the evidence suggested

> that Companion Life did not consider Dr. Michael Garcia's opinions before denying Chandhok's disability claim. . . .  The [Restrictions/Limitations per attending physician(s)][8] section does not include any restrictions after Legant's

---

[8]"Restrictions/Limitations" in this context refers to restrictions placed on Chandhok's ability to return to work.  MOO at 1188.  Dr. Garcia's August 17, 2016, record, see Aug. 17 Dr. Garcia Notes at 5 (dated Aug. 17, 2016)(A.R. at 853), notes that it was his "opinion that the patient is not ready to return to work due to ongoing pain and the sedating effects of his current medication."  MOO, 478 F. Supp. 3d at 1188.

> note [Medical Certificate for Return to Work at 1 (dated July 5, 2016)(A.R. at 666)],
> even though Dr. Garcia made one such restriction on August 17, 2016[, Aug. 17
> Dr. Garcia Notes at 5 (dated Aug. 17, 2016)(A.R. at 853)].

MOO, 478 F. Supp. 3d at 1188 (citing Second Medical Review Form at 5). The Court continued

that Companion Life's August 24, 2018, evaluation, see Second Letter at 1-3, of Chandhok's case

included two post-July 5, 2016, restrictions from Mr. Kevin Heiskala, see Heiskala Notes at 1-13,

and Dr. Zachary Haas, see Dr. Haas Notes at 1-8, but did not mention Dr. Garcia's August 17,

2016, restriction, see Aug. 17 Dr. Garcia Notes at 5. See MOO, 478 F. Supp. 3d at 1188. The

Court explained that neither Companion Life's August 4, 2017, see First Letter at 1, nor the August

24, 2018, see Second Letter at 1-3, denial of long-term disability letters reference Dr. Garcia's

August 17, 2016, medical note, see Aug. 17 Dr. Garcia Notes at 5. See MOO, 478 F. Supp. 3d at

1188. Accordingly, the Court concluded:

> There is, accordingly, no evidence that Companion Life considered, let
> alone rationally discounted, Dr. Garcia's opinion that Chandhok was disabled after
> July 5, 2016. This evidence is important. It directly contradicts Companion Life's
> final conclusion. Not considering this evidence means Companion Life did not
> make its decision to deny Chandhok employment benefits 'on a reasoned basis,'
> and it must evaluate more closely the record.

MOO, 478 F. Supp. 3d at 1188 (quoting Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209,

1212 (10th Cir. 2006)).

### 2.   **The Motion.**

On September 4, 2020, Companion Life filed the Motion and filed a memorandum in

support of its Motion. See Memorandum of Law in Support of Companion Life Insurance

Company's Motion to Alter or Amend, filed September 4, 2020 (Doc. 31-1)("Reconsideration

Memo."). Companion Life argues that the Court should amend its MOO "'to correct clear error

or prevent manifest injustice.'" Reconsideration Memo. at 4 (quoting Servants of the Paraclete v.

Does, 204 F.3d 1005, 1012 (10th Cir. 2000)). Companion Life contends that the Court committed

a clear error by concluding that Companion Life's decision that Chandhok's disability ended on July 5, 2016, was arbitrary and capricious, because: (i) Companion Life's decision was appropriately based upon Dr. Paul Legant's opinion, see Medical Certificate for Return to Work at 1, as well as other records; (ii) Companion Life's policy discontinues benefits on the date a person is no longer disabled, and therefore, Dr. Legant's clearance proves: (a) that Chandhok's disability had ended; and (b) that any later medical report to the contrary is an out-of-policy development of a new disability; and (iii) the Court noted that reliance on Dr. Legant's July 5, 2016, report, see July 5 Dr. Legant Notes at 1-7, was adequate justification to find Chandhok was no longer disabled.  See Reconsideration Memo. at 2-4.

Companion Life explains that Dr. Legant's July 5, 2016, opinion, see July 5 Dr. Legant Notes at 1-7, justifies the conclusion that Chandhok was no longer disabled as of July 5, 2016.  See Reconsideration Memo. at 4.  Companion Life insists that the Court's concern regarding medical records from after July 5, 2016, which contradict Dr. Legant's conclusion, is unnecessary because these later records are from months later, and, in the case of Dr. Garcia's August 17, 2016, opinion, see Aug. 17 Dr. Garcia Notes at 5, it stresses Dr. Garcia "unlike Dr. Legant who is a specialist . . . [I]s a Family Practice doctor."  Reconsideration Memo. at 4.  Companion Life continues that Dr. Garcia's August 17, 2016, opinion, see Aug. 17 Dr. Garcia Notes at 5, "simply accepted Plaintiff's self-reported complaints."  Reconsideration Memo. at 5-6, n.7.  Companion Life, therefore, urges that reliance on Dr. Legant's conclusion "that Plaintiff could return to work without restrictions as of July 5, 2016," is "'reasonable and made in good faith.'"  Reconsideration Memo. at 5-6 (quoting Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 826 (10th Cir. 2008)).

Companion Life argues that "[t]he question before [it] was when Disability was no longer supported.  Because when the Disability ended, so too did Plaintiff's coverage under the Policy

for any future Disability claim." Reconsideration Memo. at 5. Companion Life states that Chandhok's disability ended on July 5, 2016, with his receipt of clearance to return to work. See Reconsideration Memo. at 5. Companion Life urges that, because Chandhok did not return to full-time work after this clearance that he lost eligibility for the coverage, and, therefore, "was not insured under the Policy and no benefits would be payable," should he become disabled again. Reconsideration Memo. at 5. Companion Life asserts that medical records from after Dr. Legant's July 5, 2016, report, see July 5 Dr. Legant Notes at 1-7, which demonstrate Chandhok was disabled after July 5, 2016, at most prove that Chandhok was disabled later. See Reconsideration Memo. at 5-6. Companion Life, therefore, insists that these later records "are irrelevant" to determining whether he was disabled on July 5, 2016. Reconsideration Memo. at 5-6. Companion Life, therefore, alleges that the Court "'misapprehended the facts,'" and "a party's position'" in concluding that the later medical reports should have been considered in determining whether Chandhok was disabled as of July 5, 2016. Reconsideration Memo. at 6 (quoting Nelson v. City of Albuquerque, 921 F.3d 925, 929 (10th Cir. 2019)).

Companion Life emphasizes that, in its MOO, the Court recognizes that "the medical records that actually address Plaintiff's medical condition as of July 5, 2016 provide 'adequate justification' for denying further benefits as of that date."[9] Reconsideration Memo. at 5 (quoting

---

[9]The Court notes that, throughout its Motion, Companion Life takes references to the Court's MOO out of context. See Reconsideration Memo. at 2. Companion Life insists that, in the MOO, the Court concludes that Companion Life's reliance upon Dr. Legant's July 5, 2016, opinion, see July 5 Dr. Legant Notes at 1-7, provides "adequate justification" to deny further benefits as of that date, Reconsideration Memo. at 5. More accurately, the Court concluded that "this rationale is an adequate justification for denying Chandhok's claim if the medical evidence ended on July 5, 2016." MOO, 478 F. Supp. 3d at 1187. Companion Life also asserts that the Court references a September 13, 2016, report which shows that Chandhok "had improved," and notes that "[m]ost of the treatment notes referred to by the Court [in the MOO] are from several months to years after July 5, 2016." Reconsideration Memo. at 5. Notably, Companion Life does

- 13 -

MOO, 487 F. Supp. 3d at 1187).  Companion Life states that "the arbitrary and capricious standard merely requires courts to consider 'whether [the] interpretation [of the plan] was reasonable and made in good faith.'  This standard does not require Defendant's decision to be 'the only logical one or even the superlative one.'"  Reconsideration Memo. at 6 (quoting Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 826 (10th Cir. 2008), and Adamson v. UNUM Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006)).  Companion Life submits, therefore, that the Court should alter its holding that "'Companion Life Insurance Company's conclusion that Chandhok's disability ended on July 5, 2016, is arbitrary and capricious.'"  Reconsideration Memo. at 6 (quoting MOO, 478 F. Supp. 3d at 1186).

## 2. **The Response.**

Chandhok responds to the Motion.  See Plaintiff's Response to Defendant Companion Life Insurance Company's Motion to Alter or Amend, filed Sept. 25, 2020 (Doc. 34)("Response").  Chandhok rebuts Companion Life's continued reliance on Dr. Legant's July 5, 2016, opinion, and asserts that Companion Life, through this Motion, is attempting to "evade the Court's order to reconsider the Dr. Legant opinion . . . in light of additional medical evidence."  Response at 2.  Chandhok explains that there are numerous medical records both leading up to and after July 5, 2016, which contradict directly Dr. Legant's conclusion and, therefore, the idea that his opinion provides "adequate justification for denial of disability on July 5, 2016."  Response at 4-5.  These records include Dr. Garcia's notes from August 17, 2016, see Aug. 17 Dr. Garcia Notes at 5, and records of Chandhok's visits to Dr. Garcia "on June 20, June 28, and July 7, 2016, for multiple complaints of his neck, back, shoulder, and knee pain."  Response at 4.  Chandhok maintains that

---

not account for the Court's reference to four separate medical records which offer conflicting conclusions to Dr. Legant's conclusion, and which occurred within a month after the July 5, 2016, report, see July 5 Dr. Legant Notes at 1-7.  See MOO, 478 F. Supp. 3d at 1187.

Companion Life continues to "conveniently ignore" these multiple sources of evidence, including Dr. Legant's diagnosis of a one-percent permanent impairment of Chandhok's foot and early evidence of mental health issues, to support its conclusion that Chandhok's disability ended on July 5, 2016. Response at 5. Chandhok argues that the later medical records show that Chandhok "did not have a remission of his symptoms on July 5, 2016, but [Chandhok's symptoms] continued on and got worse." Response at 5. Chandhok concludes that, given this contradictory evidence, Companion Life's assertion that its decision was "reasonable and in good faith" is a "conclusory statement of general law. Defendant apparently relies on its prior recitation of the sufficiency of the evidence to support its denial." Response at 5.

Chandhok also responds to the argument concerning Companion Life's interpretation of the policy language, noting that Companion Life does not "point out how its interpretation of lost coverage makes sense." Response at 5. Chandhok argues that "coverage is determined on date disability begins, then continues during period of policy to retirement age. Even if Plaintiff was not disabled July 5, 2016, and again disabled August 2016 as Defendant argues, coverage would be unaffected." Response at 3. Chandhok further contends that, even if there were a momentary remission in his disability on July 5, 2016, the policy's language would continue to support the provision of benefits, because

> if the disabled person returns to work "'as an Active Employee for 6 months or more, any recurrence of a disability will be treated as a new Disability.'" Applying this definition to the claims of Defendant that Mr. Chandhok was not disabled July 5, 2016 and may have been disabled again August 2016, the claim would continue under the original claim.[10]

---

[10]Chandhok does not mention that he did not return to work after Dr. Legant's July 5, 2016, conclusion, see July 5 Dr. Legant Notes at 1-7, nor does he address how that conclusion affects the policy interpretation of the policy if the conclusion that the disability ended on July 5, 2016, is accepted.

Response at 7.  Chandhok concludes that the "Defendant has asserted a Motion without legal authority to support its policy interpretation, nor can the policy language easily support its contention."  Response at 8.

### 3.       The Hearing.

The Court held a hearing on October 5, 2020.  See Clerk's Minutes at 1.  Companion Life argued that the standard of review, if a decision is arbitrary and capricious, means that "as long as Companion Life has put out a probable interpretation, it has to be upheld even if the Court or other counsel put forth their own reasonable interpretation."    Draft Transcript of Hearing at 4:21-24 (taken October 5, 2020)(Bachrach, Rawley)("Tr.").[11]  Companion Life argued, therefore, that the Court should defer to Companion Life's judgment that there is "reasonable evidence that supports the conclusion that he was not disabled after" July 5, 2016.  Tr. at 6:1-3 (Bachrach).

Companion Life maintained that it justifies its finding that Chandhok was no longer disabled on July 5, 2016, because (i) Dr. Legant's July 5, 2016, report, see July 5 Dr. Legant Notes at 1-7, concludes that from "an orthopedic and neurologic standpoint Mr. Chandhok could return to work without limitations"; (ii) an electromyography from April 7, 2016, see Second Medical Review Form at 6 (A.R. at 288), was within normal limits; (iii) thoracic, cervical, and lumbar MRI results show minimal degeneration, see Second Medical Review Form at 6; (iv) Dr. Suter, see Dr. Suter Notes at 1-5, concluded "that although Mr. Chandhok complained of heel pain, there was normal muscle strength, tone, sensation, and no swelling," Tr. at 5:13-25 (Bachrach).  Companion Life contended that this record is "reasonable evidence that supports the conclusion" and that the records after July 5, 2016, do not alter its decision or make it unreasonable.  Tr. at 6:1-7 (Bachrach).

---

[11]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Companion Life argued that the records after July 5, 2016, "refer almost entirely to self-reported complaints of pain . . . [and] are also inconsistent where he complained about some things to doctors but not to others."  Tr. at 6:7-12 (Bachrach).  Companion Life asserted that, when "you look at all the negative tests that were performed here, you're left with only self-reported complaints.  Is that enough to sustain his burden of proof under this deferential standard?  The courts have said no."  Tr. at 6:12-19 (Bachrach).  Companion Life urged that its policy requires diagnostic testing for proof of loss and that, regarding the July 5, 2016, decision, there was diagnostic testing done on Mr. Chandhok "but it is just all negative."  Tr. at 6:21-24 (Bachrach).

Companion Life contended that the Court's concern about Dr. Garcia's later medical reports is unnecessary, because these reports were "insufficient to establish a disability."  Tr. at 7:11-12 (Bachrach).  Companion Life maintained that it reviewed and considered Dr. Garcia's August 17, 2016, report, see Aug. 17 Dr. Garcia Notes at 5, but that the denial letter does not reference Dr. Garcia's August 17, 2016, report, because "it was two months [later] and it doesn't establish that disability was established back on July 5, 2016."  Tr. at 7:1-6 (Bachrach).  Companion Life urged the Court to consider that, "for one thing, Dr. Legant is a specialist. Dr. Garcia isn't.   Dr. Garcia is a family practice doctor to Mr. Chandhok . . . .  It's also . . . important to note that Dr. Garcia not only is not a specialist, he referred Mr. Chandhok to specialists."  Tr. at 7:6-14 (Bachrach).  Companion Life maintained that Dr. Legant is the specialist that Chandhok then saw and that Dr. Legant "said of course plaintiff can return to work."  Tr. at 8:8-13 (Bachrach).  Companion Life urged the Court to disregard other medical reports close in time to the July 5, 2016, opinion, see July 5 Dr. Legant Notes at 1-7 (dated July 5, 2016)(A.R. at 560-66), stating that (i) the July 1l, 2016, report, see Dr. Kassicieh Treatment Notes at 2 (dated July 11, 2016)(A.R. at 588), is "prepared by a doctor that is barely legible.  What one can read

shows only that the doctor was referring to subjective complaints"; (ii) that the June 20, 2016, report, see June 20 Dr. Garcia Notes at 1 (dated June 20, 2016)(A.R. at 116), does not account for an earlier x-ray that shows normalcy in Chandhok's knee and that there is no MRI record to show injury; (iii) that Dr. Garcia, on June 28, 2016, see June 28 Dr. Garcia Notes at 1 (dated June 28, 2016)(A.R. at 109), recommends that Chandhok see the specialist -- in this case Dr. Legant; and (iv) Dr. Kassicieh's July 11, 2016, report, see Dr. Kassicieh Treatment Notes at 2, references only Chandhok's self-reported pain, which "is not proof of disability."  Tr. at 7:22-8:11; 9:15-21 (Bachrach).  Companion Life asserted that Dr. Legant's finding of a one-percent impairment rating to Chandhok's right foot and ankle does not detract from his finding that Chandhok was able to return to work without restrictions.  See Tr. at 12:5-8 (Bachrach).

Companion Life maintained that Chandhok's interpretation of the policy is incorrect.  See Tr. at 10:20-11:3 (Bachrach).  Companion Life asserted that the policy that covers Chandhok was a group policy which required all employees to be "active employee[s] [who] works on a regular basis at least 30 hours per week" to be eligible for coverage.  Tr. at 11:3-6 (Bachrach).  Companion Life insisted that "Mr. Chandhok had not worked on a regular basis at least 30 hours a week since March[, 2016,] so under no reasonable interpretation could he be considered an active employee and therefore under the terms of the policy his coverage ended."  Tr. at 11:7-11 (Bachrach).  Companion Life stressed that, because Chandhok did not return to work after Dr. Legant's July 5, 2016, conclusion, see July 5 Dr. Legant Notes at 1-7, he thus became ineligible for coverage and, no "recurrent disability" could occur that would allow for the continuance of disability benefits, Tr. at 11:15-21 (Bachrach).  Companion Life, therefore, contended that "it doesn't matter how [Chandhok's] condition was in 2017, 2018, or 2019, because he is no longer insured under the policy."  Tr. at 12:18-22 (Bachrach).

Companion Life concluded by arguing that it does not think "it can be considered arbitrary and capricious to [weigh the] opinion of a specialist like Dr. Legant over plaintiff's family practice doctor." Tr. at 9:2-5 (Bachrach). Companion Life cited Black & Decker Disability Plan v. Nord, 583 U.S. 822 (2003), to support the proposition that, in decision-making under ERISA "there are times, especially when [a doctor] is not a specialist[, that] it makes no sense to give special weight to their opinions, and that's the case here." Tr. at 9:5-13 (Bachrach). Companion Life acknowledged that contradictory evidence must be weighed against all other evidence and conceded the Court's point that "self-reporting and then a doctor taking that down is not zero [evidence]." Tr. at 10:1-7 (Court; Bachrach). Companion Life maintained, citing Kimber v. Thiokol Corp., 196 F.3d 1092 (10th Cir. 1999), that the Court need not hold that Companion Life's decision is best decision, but, rather, need only hold that the decision "is grounded on any reasonable basis." Tr. at 13:12-17.

In response, Chandhok argued that "the opinion of Dr. Legant is not reasonable to rely on in the context of all the other evidence." Tr. at 15:12-14 (Rawley). Chandhok maintained that the "prior records, the contemporaneous records just before and after the July 5 date and the later records that go on all are supportive that he had a bad injury to his foot." Tr. at 16:4-8 (Rawley). Chandhok stressed Dr. Legant's conclusion, see July 5 Dr. Legant Notes at 1-7, that Chandhok's foot was one-percent impaired, and "that this was a gentleman who manifested from January forward that he was having trouble walking the walk at work where he was a car salesman and had a big lot to cover." Tr. at 16:11-17 (Rawley). Chandhok further stressed that all MRI records exhibited degenerative results rather than "normal" results. Tr. at 17:7-10 (Rawley).

Chandhok then asserted that the medical conclusions from around July 5, 2016, demonstrate his disability, because: (i) Dr. Kassicieh's July 11, 2016, report, see Dr. Kassicieh

Treatment Notes at 2 (dated July 20, 2016)(A.R. at 588), finds "continued neck pain, continued left shoulder, continued hand and continued left knee and right heel pain," Tr. at 18:10-16 (Rawley); (ii) Dr. Garcia's June 20, 2016, conclusion, see June 20 Dr. Garcia Notes at 1, that Chandhok needed to see a podiatrist, describes Chandhok's "situational depression," and "depressed mood and anger since the accident," and recommends Lexapro,[12] and discusses of how "the workers' comp. provider is not providing the follow-up with orthopedics for the spine, only podiatry,"  Tr. at 19:1-13 (Rawley); (iii) a June 28, 2016, report, see June 28 Dr. Garcia Notes at 1, details that Chandhok's knee is minimally swollen and tender, and describes Chandhok's depression, lower back pain, and his "neck, back, shoulder, knee, [and] ankle [pain]," Tr. at 19:20-25 (Rawley); and (iv) Dr. Garcia's July 7, 2016, report, see July 7 Dr. Garcia Notes at 3-4, which documents the same pain, and notes the "unhappiness of [Chandhok] with Dr. Legant who didn't examine him, review his MRIs," Tr. at 20:18-23 (Rawley).   Chandhok emphasized that these medical conclusions contradict directly Dr. Legant's July 5, 2016, conclusion, see July 5 Dr. Legant Notes at 1-7, that Chandhok was able to return to work without restriction,  see Tr. at 22:3-5 (Rawley). Chandhok further expresses the belief that "Dr. Legant, because he's really saying from an orthopedic and neurologic [viewpoint], meaning he hasn't found sufficient abnormality orthopedically or neurologically to restrict him.  I don't think he really is saying there is no problem here and no restriction the person would have."  Tr. at 22:5-11 (Rawley).  Chandhok emphasized the podiatrist's continued conclusions that Chandhok had a heel spur and argued that Dr. Legant's opinion cannot the podiatrist's continued, consistent conclusion.  See Tr. at 24:14-25:5 (Rawley).

---

[12]Lexapro is "is an antidepressant belonging to a group of drugs called selective serotonin reuptake inhibitors (SSRIs). [Lexapro] affects the levels of certain chemicals in the brain that may be altered in people suffering from depression or anxiety." Lexapro, Drugs.com (June 24, 2021, 4:00 PM), https://www.drugs.com/lexapro.html .

Chandhok concluded:

> [T]hose medical records call into question a great deal whether or not it's reasonable to take Dr. Legant's report in isolation and say ok he's alright . . . . And I think that the later reports which are consistent with the complaints that he continues to have of the neck, shoulder, low back, knee, and heel [pain], and the depression, lend greater credibility to those reports that were ignored.

Tr. at 25:17-25 (Rawley).  Chandhok insisted that Companion Life should have considered Chandhok's depression and argued that Dr. Legant is not an expert in mental health.  See Tr. at 26:1-2 (Rawley).  Chandhok cited Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), and analogized:

> The emphasis of favorable medical reports and the de-emphasis of unfavorable ones, as well as internal experts . . . . I find that very analogous to our situation where we have one doctor . . . giving a full release after its lengthy description of all the difficulties the person [had] . . . [but] it's contradicted by every other medical record that describes his injuries.

Tr. at 26:22-27:12 (Rawley).  Chandhok also noted that Companion Life is attempting to "flip [the Court's] statement on its head" in its emphasis that the Court agreed that its reliance on the July 5, 2016, report "adequately justified" the conclusion that Chandhok's disability had ended.  Tr. at 28:6-11 (Rawley).  Chandhok continued: "But that's ignoring that" the Court "said" reliance on Dr. Legant's July 5, 2016, report "would be adequate" to conclude Chandhok's disability ended July 5, 2016 "were it not for all these other records that say something different and need to be considered."  Tr. at 28:11-14 (Rawley).

Chandhok next discussed the policy language about recurring disabilities.  See Tr. at 28:20 (Rawley).  Chandhok asserted that "the idea that he has to go back to work and then the disability has to arise again during the period of time that he's back to work is an incredible overreach of anything in this policy."  Tr. at 29:15-19 (Rawley).  Chandhok maintained that the policy's language "doesn't say you must return to work in order to then recover again in order to reestablish your coverage."  Tr. at 30:18-20 (Rawley).  Chandhok insisted that, in this case, Companion Life

erred by misinterpreting the policy language and terminating coverage, and that Companion Life's error is "confus[ing] continuation of benefits with continuation of coverage. . . .   This is continuation of benefits for a previously covered claim." Tr. at 32:23-33:2 (Rawley).  Chandhok maintained that this argument is hypothetical, because the main contention is that his disability did not come to an end on July 5, 2016.  See Tr. at 33:8-12 (Rawley).  Chandhok contended that "there is no case law that indicates that, later on if you have a good month or two or any period of time, that if you continue, after that respite, to have the same disability that was originally covered it will no longer be covered.  They just don't say that."  Tr. at 33:17-22 (Rawley).  Chandhok concluded this line of argument, stating:

> I think they have to point to something in the policy that clearly informs somebody that after they establish a claim, should they return to work they risk no longer having coverage for that claim because they will have to reestablish the claim as if it had never occurred before, as a new claim.  I think that's contrary to the concept that this is not a new claim.  This is the same darn claim going to the same constellation of complaints.  No new accident, nothing new.

Tr. at 35:1-11 (Rawley).

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i)     a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e);
>
> (ii)    a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and
>
> (iii)   a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Price v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d

1292, 1296 (10th Cir. 2002).

### 1. Motions for Reconsideration Under Rules 59(e) and 60(b).

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment. See Price v. Philpot, 420 F.3d at 1167 n.9. If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b). See Price v. Philpot, 420 F.3d at 1167 n.9. "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved." Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished)[13]. The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment. See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874

---

[13]The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir.2005)(citations omitted). The Court relies upon Jones v. United States and the other unpublished opinions cited herein for their persuasive value.

F.2d 751, 753 (10th Cir. 1989)).   In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)    mistake, inadvertence, surprise, or excusable neglect;
>
> (2)    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4)    the judgment is void;
>
> (5)    the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion . . . . Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.  Accord Nelson v. City of Albuquerque, 921 F.3d 925, 929 (10th Cir. 2019).  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."   Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

A court cannot enlarge the time for filing a rule 59(e) motion.   See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e). . . ."),   "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."   James Moore et. al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted).   Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e).'"   Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005)(quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.   See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority").   Mistakes in this context entail either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.   See Yapp v. Excel Corp., 186 F.3d at 1231.   If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.   See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that

attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).   The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  12 Moore's Federal Practice § 60.48[2], at 60-182, (3d ed. 1999). Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,'" Liljeberg v. Health Servs. Acquisition Corp.,

486 U.S. at 863-64 (quoting <u>Klapprott v. United States</u>, 335 U.S. 601, 614-15 (1949)), "while also cautioning that it should only be applied in 'extraordinary circumstances,'" <u>Liljeberg v. Health Servs. Acquisition Corp.</u>, 486 U.S. at 864 (quoting <u>Ackermann v. United States</u>, 340 U.S. 193, 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. <u>See Ackermann v. United States</u>, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in <u>Van Skiver v. United States</u>:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by <u>Pierce [v. Cook & Co.</u>, 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." <u>Pierce v. Cook & Co.</u>, 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). <u>Collins v. City of Wichita</u>, 254 F.2d 837, 839 (10th Cir. 1958).

<u>Van Skiver v. United States</u>, 952 F.2d at 1244-45.

## 2. <u>Motions to Reconsider Interlocutory Orders.</u>

Considerable confusion exists regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, <u>i.e.</u>, an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for

analyzing them.  A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions -- "motion[s] to alter or amend a <u>judgment</u>" -- as "motions to reconsider,"[14] compounds that baseline confusion.  Fed. R. Civ. P. 59(e)(emphasis added), <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.  <u>See</u> Fed. R. Civ. P. 54(a)("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>.")(emphasis added).  In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts"), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  <u>See</u> Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice

---

[14]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.  <u>See</u>, <u>e.g.</u>, 204 F.3d at 1005.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days  of the entry of judgment, which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge  Kelly - - and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate,  rather  than  rejecting it as  untimely or inappropriate.

of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's jurisdiction, and the district court needs the court of appeals' permission even to grant a rule 60 motion.  See Fed. R. App. P. 4(a)(4)(B).  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.  See Fed. R. App. P. 4(a)(4)(B).

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. When a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and  put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, and not the final judgment.  Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice

of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d  1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)).  Because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, however, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment.  See Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the  case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, 204 F.3d 1005, incorporated traditional law-of-the-case grounds -- the same grounds that

inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142  F.3d 1243,  1247 (10th Cir. 1998)(departing from the  law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those three grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not mention specifically motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P.  54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one

judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)(Posner, J.)). In short, a district court can select the standard of review for a motion to reconsider an interlocutory order. It can: (i) review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch; (ii) review the ruling de novo but limit its review; (iii) require parties to establish one of the law-of-the-case grounds; or (iv) refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(quoting Avitia v. Metro. Club of Chicago, Inc., 49 F.3d at 1227). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How thoroughly the Court addressed a point depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[15] than when the prior ruling is, e.g., a short

_____

[15]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "Amended or Additional Findings. On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for

discovery ruling.  The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.  Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling that it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance that the opposing party has placed in the court's prior ruling.  See Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 4478.1, at 695-96 (2d ed. 2002)("Stability becomes increasingly important as the proceeding nears final  disposition.  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses;  and several months pass, then the plaintiffs should face a higher burden in moving the Court to

---

a new trial under Rule 59."  Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its twenty-eight-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

reconsider its prior ruling that they faced in fighting the motion for protective order the first time. Third, the Court should consider the Servants of the Paraclete v. Does grounds.  See  Servants of the Paraclete v. Does, 204 F.3d at 1012.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not mean necessarily that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived the right to appeal the alleged error by not raising the appropriate argument. See Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d 1115, 1142 (D.N.M. 2018)(Browning, J.), aff'd sub nom, Lopez v. Stanley Black & Decker, Inc., 764 F. App'x 703 (10th Cir. 2019).  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential

standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produced the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time that the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly

refute both the counterarguments and evidence that the opposing party used to win the prior ruling

and any new arguments and evidence that the opposing party produces while opposing the motion

to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and

is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for

reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning

legal position, but the work ethic and tenacity to single-handedly lead the court to his or her way

of thinking.

## ANALYSIS

Companion Life has not demonstrated that the Court "misapprehended the facts, a party's

position, or the controlling law," and, therefore, the Court will not alter its judgment under rule

59(e).[16] Servants of Paracletes v. Does, 204 F.3d at 1012.  Where, as here, "a reconsideration

motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59

motion and be subject to rule 59's constraints."  United States v. Young, No. CR 17-0694 JB, 2021

WL 534869, at *17 (D.N.M. Feb. 11, 2021)(Browning, J.).  To qualify for relief under rule 59(e),

Companion Life must demonstrate: (i) "the motion is necessary to correct manifest errors of law

or fact upon which the judgment is based"; (ii) "newly discovered or previously unavailable

evidence" exists; (iii) the necessity "to prevent manifest injustice"; or (iv) that there has been "an

intervening change in controlling law."  11 Charles Alan Wright & Arthur R. Miller, Federal

Practice and Procedure, § 2810.1 (3d ed. 2021).  See Servants of Paraclete v. Does, 204 F.3d at

1012; Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d at

---

[16]Companion Life filed this Motion within the twenty-eight-day filing window that rule 59(e) establishes.  The Court entered Final Judgment (Doc. 30) on August 13, 2020, Companion Life then filed this Motion to alter or amend judgment on September 4, 2020, and, thus, Companion Life filed the Motion twenty-two days after the entry of Final Judgment.

1200.  See also Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008)(reiterating that motions to reconsider under rule 59(e) are not meant to "'relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment'")(quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, 127-28 (2d ed. 1995)).  By contrast, a rule 59(e) motion is not an "appropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."  Servants of Paraclete v. Does, 204 F.3d at 1012.  Here, because Companion Life attempts to "rehash[] the same arguments from the first motion, and essentially asks the Court to grant" Companion Life "a mulligan on its earlier failure to present persuasive argument and evidence," the Court will not alter the MOO.  XTO Energy, Inc. v. ATD, LLC, 189 F. Supp. 3d 1174, 1191 (D.N.M. 2016)(Browning, J.).

The Court concludes that Companion Life's argument for reconsideration misconstrues the Court's holding in its MOO, 478 F. Supp. 3d at 1186-88.  Companion Life misconstrues the Court's statement that there is "adequate justification" to find Chandhok's disability ended on July 5, 2016, by clinging to that statement without considering the remainder of the Court's conclusion that the context of medical opinions after Dr. Legant's July 5, 2016, opinion, make sole reliance on Dr. Legant's opinion, without adequate dismissal of multiple other medical opinions, unreasonable. [17]  Reconsideration Memo. at 5.  Companion Life asserts that the Court's determination is "contrary to the facts, the language in the policy and the Court's own conclusion." Reconsideration Memo. at 4.  Companion Life also argues that the Court misapprehended the facts surrounding Companion Life's determination when Chandhok's disability ended.  See

---

[17]On remand, Companion Life could again choose to value more highly Dr. Legant's opinion, as long as it provides adequate justification for doing so and addresses the other doctors' opinions.

Reconsideration Memo. at 5.  In other words, Companion Life argues that the Court should grant

its Motion, because "the motion is necessary to correct manifest errors of law or fact upon which

the judgment is based . . . ."  Wright & Miller, <u>supra</u>, § 2810.1.  Companion Life does not argue,

and the Court does not see how, any other grounds for rule 59(e) relief apply in this case.  <u>See</u>

Reconsideration Memo. at 1-8; <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. at 485 n.5; Wright & Miller,

<u>supra</u>, § 2810.1.  Companion Life uses its misconstrued interpretation of the MOO to: (i) raise new

arguments; and (ii) present evidence that could have been, and was, raised before the Court entered

Final Judgment.  Companion Life, in filing this motion, persists in its argument that, so long as it

presses its views devoid of broader context and ignorant of contradictory evidence, that it must be

vindicated.  The Court, accordingly, denies Companion Life's Motion.

**I.      THE COURT WILL NOT AMEND ITS CONCLUSION THAT COMPANION LIFE'S DETERMINATION THAT CHANDHOK'S DISABILITY ENDED JULY 5, 2016, WAS ARBITRARY AND CAPRICIOUS, BECAUSE THE COURT DID NOT MAKE AN ERROR OF FACT OR LAW, MANIFEST OR OTHERWISE, IN ITS MOO.**

Companion Life has not persuaded the Court that it is doing anything other than

"'relitigat[ing] old matters, or rais[ing] arguments or present[ing] evidence that could have been

raised prior to entry of judgment.'"  <u>Nelson v. City of Albuquerque</u>, 921 F.3d at 929 (quoting

<u>Exxon Shipping Co. v. Baker</u>, 554 U.S. at 485 n.5).  Companion Life takes as its starting point the

Court's conclusion that it provided "'adequate justification'" to conclude that disability ended on

July 5, 2016.  Reconsideration Memo. at 4 (quoting MOO, 478 F. Supp. 3d at 1187).  Companion

Life's characterization of this conclusion takes the Court's conclusion out of context; in its MOO,

the Court states that Companion Life's

> rationale is an adequate justification for denying Chandhok's claim if the medical evidence ended on July 5, 2016.  Neither this [August 24, 2018, denial letter] nor Companion Life's 2017 denial letter discuss or analyze Chandhok's medical appointments after July 5, 2016.  The record is, however, replete with evidence that Chandhok was still experiencing severe pain after Dr. Legant provided him a note

allowing him to return to work.

MOO, 478 F. Supp. 3d at 1187.  In its attempt to sidestep the important context for the Court's conclusion -- in which it does not not point out how the Court misapprehended the facts or Companion Life's position -- Companion Life argues that July 5, 2016, marks Chandhok's recovery date, and then repackages its policy coverage arguments from the Memo.  See Reconsideration Memo. at 5.  Cf. Memo. at 26-28 ("[C]overage under the policy ends when an insured 'cease[s] to be a Full-time Active Employee in an eligible class for any reason.' A.R. at 209.  Based on this language, Plaintiff is not eligible for benefits for any disability that may have occurred after March 4, 2016.").  Companion Life argues that, when Dr. Legant authorized Chandhok to return to work, see July 5 Dr. Legant Notes at 1-7, that this marked the definitive end of Chandhok's disability, and, therefore, disability benefits must end because the policy states "'[b]enefit payments will stop on the earliest of . . . the date You are no longer disabled." Reconsideration Memo. at 5 (quoting A.R. at 2797).  Here, Companion Life repeats its argument that after Dr. Legant authorized Chandhok to return to work, and Chandhok did not return, that Chandhok's "coverage under the Policy terminated" because he had ceased being a full-time, active employee in March, 2016, and that, "[t]o the extent the Court believes that Plaintiff became disabled again in August 2016, he was no longer insured under the policy."  Reconsideration Memo. at 3.  Companion Life, in its Motion for Summary Judgment, argued that the same policy language precluded Chandhok from receiving any disability benefits because he had "cease[d] to be a Full-time Active Employee in an eligible class" when he stopped working on March 4, 2016, and had not proven his disability before this date.  Memo. at 15.  Companion Life uses the policy language regarding coverage and the end of disability to raise a new argument that later medical records exhibit a new or recurring disability, rather than "comment on Plaintiff's condition during the relevant time -- July 5, 2016."  Reconsideration Memo. at 5.  The Court concludes that this

argument is a new take on existing facts and does not take into consideration the Court's true subject of concern -- that later medical evidence contradicts Dr. Legant's July 5, 2016, conclusion, see July 5 Dr. Legant Notes at 1-7, that Chandhok was no longer disabled, and that Companion Life does not justify adequately its reasoning for overlooking these later pieces of evidence to determine Chandhok's disability ended on July 5, 2016.  See MOO, 478 F. Supp. 3d at 1187-88.

     **A.**     **THE COURT DID NOT MAKE AN ERROR OF LAW IN THE MOO, BECAUSE THE COURT CORRECTLY EVALUATED COMPANION LIFE'S POLICY DETERMINATION UNDER THE ARBITRARY-AND-CAPRICIOUS STANDARD.**

     Companion Life's motion "merely advances new arguments" to relitigate the issue whether its conclusion that Chandhok was no longer disabled on July 5, 2016, was arbitrary and capricious. Servants of Paraclete v. Does, 204 F.3d at 1012.  Making these arguments, Companion Life has relied on an out-of-context statement from the Court that Companion Life's reliance on Dr. Legant's July 5, 2016, report, see July 5 Dr. Legant Notes at 1-7, "provided 'adequate justification' for concluding that Disability was not supported" beginning on that date. Reconsideration Memo. at 4 (quoting MOO, 478 F. Supp. 3d at 1187).  Companion Life asserts that "[t]he question before Companion Life was when Disability was no longer supported. Because when Disability ended, so too did Plaintiff's coverage under the Policy for any future disability claim."  Reconsideration Memo. at 5.  Companion Life maintains that it was correct in determining Chandhok was no longer disabled on July 5, 2016, and provides a new theory for its lack of consideration of later medical evidence -- that medical evidence subsequent to July 5, 2016, supports only later disabilities for which Chandhok would no longer be eligible for coverage.  See Reconsideration Memo. at 5.  The Court concludes that this argument is a new argument related to the original issue of policy coverage and Chandhok's eligibility that could have been raised before the Court entered Final Judgment.  See Nelson v. City of Albuquerque, 921 F.3d at 929

("rule 59(e) motions are 'not appropriate to . . . advance arguments that could have been raised in prior briefing'" (quoting Exxon Shipping Co. v. Baker, 554 U.S. at 485 n.5)).  See Reconsideration Memo. at 5-6; Memo. at 19 ("Plaintiff's coverage under the policy stopped when he stopped work. So if the onset date is March 10, 2016, he was no longer covered.  Any disability that arose on March 10, 2016 or after that date was not covered under the policy.")

Companion Life, in arguing this new theory, misrepresents the Court's concern regarding Companion Life's determination that disability ended on July 5, 2016.  See Reconsideration Memo. at 4-6.  Companion Life states, regarding the Court's focus on medical records after July 5, 2016, that "the Court believed that it mattered whether Plaintiff was Disabled after benefits were reasonably terminated."  Reconsideration Memo. at 6.  The Court's conclusion regarding Companion Life's original determination is not that later medical records which establish disability should allow for the continuation of coverage after "benefits were reasonably terminated." Reconsideration Memo. at 6.  The Court, rather, concluded that Companion Life's reliance on a single medical opinion which concludes disability ended July 5, 2016, see July 5 Dr. Legant Notes at 1-7, in the face of an array[18] of contradictory medical opinions from days and weeks after July 5[19] -- which Companion Life does not consider nor discount adequately in its analysis -- is arbitrary

---

[18]The Court, in its MOO, noted the July 14 New Mexico Orthopaedics Notes at 1 (dated July 14, 2016)(A.R. at 531-32), Dr. Kassicieh Treatment Notes at 2 (which notes a July 7, 2016, examination that "was limited due to pain"), July 22 New Mexico Orthopaedics Treatment Notes at 1 (dated July 22, 2016)(A.R. at 529), and Aug. 3 New Mexico Orthopaedics Treatment Notes at 1-2 (dated Aug. 3, 2016)(A.R. at 527-28).

[19]The Court notes that, in its Motion, Companion Life states that "[m]ost of the treatment notes referred to by the Court [in the MOO, 478 F. Supp. 3d at 1187-88,] are from several months to years after July 5, 2016, and they don't comment on Plaintiff's condition during the relevant time -- July 5, 2016."  Reconsideration Memo. at 5.  Companion Life again mischaracterizes the Court's conclusions.  In the MOO, the Court references thirteen separate treatment notes which evidence that Chandhok was still suffering from severe pain after July 5, 2016, and that over one-third of these appointments occurred within one month of Dr. Legant's own recording.

and capricious.  See MOO, 478 F. Supp. 3d at 1187-88.  For that reason, the Court concluded that

Companion Life did not reasonably terminate Chandhok's benefits.  See MOO, 478 F. Supp. 3d

at 1187-88.  The Court was disturbed Companion Life's continued total disregard for Dr. Garcia's

opinion, see Aug. 17 Dr. Garcia Notes at 5, in both its 2017 and 2018 denial letters.  See MOO,

478 F. Supp. 3d at 1188 (citing First Letter at 1; Second Letter at 1-3).  In this opinion, Dr. Garcia

stated that "it was his 'opinion that the patient is not ready to return to work due to ongoing pain

and the sedating effects of his current medications.'"  MOO, 478 F. Supp. 3d at 1188 (quoting Aug.

17 Dr. Garcia Notes at 1).  The Court concluded:

> There is, accordingly, no evidence that Companion Life considered, let alone
> rationally discounted, Dr. Garcia's opinion that Chandhok was disabled after July
> 5, 2016.  This evidence is important.  It directly contradicts Companion Life's final
> conclusion.  Not considering this evidence means Companion Life did not make its
> decision to deny Chandhok employment benefits 'on a reasoned basis,' and it must
> evaluate more closely the record.

MOO, 478 F. Supp. 3d at 1188 (quoting Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209,

1212 (10th Cir. 2006)).

Companion Life also maintains that the Court should review Companion Life's decisions

"under the deferential arbitrary and capricious standard . . . [, which] merely requires courts to

consider 'whether [the] interpretation [of the plan] was reasonable and made in good faith.'"

Reconsideration Memo. at 6 (quoting Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 826 (10th Cir.

2008).  Companion Life discusses extensively the arbitrary-and-capricious standard in its MSJ.

Compare MSJ at 5-6, 16-17, 28-29, with Reconsideration Memo. at 6.  The Court is and was aware

of the standard of review, applied this standard in its MOO, and maintains its original conclusion

that Companion Life did not make its decision "on a reasoned basis."  Kellogg v. Metro. Life Ins.

Co., 549 F.3d at 826.  See Miller v. Monumental Life Ins. Co., 671 F. Supp. 2d 1123, 1139 (D.N.M.

2009)(Browning, J.)(explaining the proper standard of remanding a case for further action if the

Court concludes an ERISA administrator has not provided adequate findings or explanations for its denial of benefits); Benson v. Prudential Fin., Inc., 731 F. Supp. 2d 1168, 1173-74 (D.N.M. 2008)(Browning, J.)(same).  The Court is not persuaded that it has "misapprehended the facts, a party's position, or the controlling law."  Servants of Paracletes v. Does, 204 F.3d at 1012.  The Court maintains its original conclusion that Companion Life's determination was arbitrary and capricious because it ignored contradictory evidence without explaining why it discounted this evidence.  The Court will not amend its conclusion that Companion Life's determination regarding the end of Chandhok's disability on July 5, 2016, is arbitrary and capricious.

**B.      THE COURT DID NOT MAKE A FACTUAL ERROR IN ITS MOO, BECAUSE THE COURT HAD ACCESS TO THE ADMINISTRATIVE RECORD AND CONSIDERED IT WHEN IT DETERMINED THAT COMPANION LIFE'S DECISION WAS ARBITRARY AND CAPRICIOUS.**

Companion Life presents evidence that it could have brought to the Court's attention before the Court entered Final Judgment to justify its reliance on Dr. Legant's July 5, 2016, opinion, see July 5 Dr. Legant Notes at 1-7, and resultant disregard of other medical opinions.  See Reconsideration Memo. at 4-5.  Specifically, the Court had access to the Administrative Record beginning on February 5, 2020, and issued the MOO on August 13, 2020, providing the Court with over six months to review the information upon which Companion Life relies in the Motion.  Companion Life states: "Defendant could refer to the fact that unlike Dr. Legant who is a specialist, Dr. Garcia is a Family Practice Doctor.  Defendant could also mention Dr. Garcia did not even refer to Plaintiff's right heel in the August 2016 note and that he relied solely on Plaintiff's unverified complaint."  Reconsideration Memo. at 5 (quoting A.R. at 853).  Companion Life, in an attempt to discount retroactively the opinions of medical professionals such as Dr. Garcia, argues that medical reports after July 5, 2016, rely primarily on the "Plaintiff's self-reported complaints."  Tr. at 6:7-12 (Bachrach).   Companion Life never mentioned these arguments in the

Memo.  Companion Life notes that it is not relying on this evidence to argue its Motion, but the Court concludes, nevertheless, that the introduction of this information in Companion Life's Motion is inappropriate, because it "merely advances . . . supporting facts which were available at the time of the original motion." Servants of Paraclete v. Does, 204 F.3d at 1012.  See Nelson v. City of Albuquerque, 921 F.3d at 929 (same).  The Court assumes that, before the Court entered Final Judgment, Companion Life was aware that Dr. Garcia is a Family Practice Doctor, rather than a specialist, like Dr. Legant.  See Second Medical Review Form at 1 (A.R. at 283)(noting that Dr. Garcia is a Primary Care Physician (PCP)).  Companion Life also had access to the August 17, 2016, note upon which Dr. Garcia relied.  See Aug. 17 Dr. Garcia Notes at 5.  Yet, in the MSJ, although Companion Life criticized Dr. Garcia's opinion as "conclusory," "unsubstantiated," and "vague," it never compares directly Dr. Garcia's expertise with Dr. Legant's.  MSJ at 21-24.  Because these "supporting facts . . . were available at the time of the original motion," the Court concludes that the arguments Companion Life raises in its motion which reference these facts do not justify altering the original judgment.  Servants of Paraclete v. Does, 204 F.3d at 1012.

ERISA does not "require administrators automatically to accord special weight to the opinions of a claimant's physician," but "[p]lan administrators . . . may not," as Companion Life did here, "arbitrarily refuse to credit a claimant's reliable evidence, including the opinion of a treating physician." Black & Decker Disability Plan v. Nord, 583 U.S. 822, 834 (2003).  The Court notes that Companion Life need not accord greater weight to Dr. Garcia's opinions as Chandhok's treating physician, however, Companion Life may not "arbitrarily refuse" to credit Dr. Garcia's opinion and then assert, as it has done here, that it has reached a reasonable conclusion in denying Chandhok's disability claim.  Black & Decker Disability Plan v. Nord, 583 U.S. at 834. The Court concludes that Companion Life may have credible reasons for discounting other medical

opinions to reach the conclusion that Chandhok was not disabled, including that one opinion comes from a specialist and multiple others from a primary care physician.  See Reconsideration Memo. at 4.  The key issue, and the reason that Companion Life's determination is arbitrary and capricious, however, is that the plan must provide adequate justification and its reasoning in discounting conflicting medical evidence; a post-hoc justification is insufficient.  See MOO, 478 F. Supp. 3d at 1187.   Companion Life, in its various denials of Chandhok's disability claim appeals "[n]either . . . discuss or analyze Chandhok's medical appointments after July 5, 2016"; Companion Life's medical examiner "summarizes these medical records, but they likewise appear to play no part in her analysis."   MOO, 478 F. Supp. 3d at 1187.  The Court's concern is not that Chandhok might have become disabled again after a miraculous July 5, 2016, recovery, but rather that "Companion Life did not consider Dr. Garcia's opinions before denying Chandhok's disability claim."  MOO, 478 F. Supp. 3d at 1188.  Given Companion Life's new arguments do not justify adequately their original dismissal without consideration of Chandhok's full medical history, including Dr. Garcia's medical opinions, the Court concludes its original decision -- that Companion Life's determination that Chandhok's disability ended July 5, 2016, is arbitrary and capricious -- remains sound.  See  MOO, 478 F. Supp. 3d at 1188.

## II.   THERE IS NO NEW EVIDENCE, MANIFEST INJUSTICE, OR ANY INTERVENING CHANGE IN CONTROLLING LAW THAT JUSTIFIES RELIEF UNDER RULE 59(e).

Companion Life, in its Motion, does not describe any newly discovered or previously unavailable evidence, manifest injustice, or intervening change in controlling law.   See Reconsideration Memo. at 1-8.  See Monge v. RG Petro-Machinery (Group) Co. Ltd., 701 F.3d 598, 611 (10th Cir. 2012)("'The purpose [of a rule 59(e)] motion is to correct manifest errors of law or to present newly discovered evidence.'" (quoting Webber v. Mefford, 43 F.3d 1340, 1345 (10th Cir. 1994))).   See also Wright & Miller, supra, § 2810.1.   True, as discussed above,

Companion Life discusses evidence in its Reconsideration Memo., but this evidence was available throughout this litigation.  See Webber v. Mefford, 43 F.3d at 1345 ("In order to supplement a Rule 59(e) motion with additional evidence . . . the movant must show either (1) that the evidence is newly discovered, or (2) if the evidence was available at the time summary judgment was granted, that counsel made a diligent yet unsuccessful attempt to discover the evidence.").  Second, Companion Life does not clear the very high bar necessary to demonstrate successfully that the Court's decision to affirm its previous MOO would create manifest injustice, because Companion Life have not alleged nor can the Court surmise any manifest injustice is at risk in this affirmation.  See United States v. Eccleston, No. CIV 19-1201 JB\CG, 2020 WL 6392821 (D.N.M. 2020)(Browning, J.)(explaining that, where defendant does not point to Tenth Circuit law, nor address Courts of Appeals' opinions that counter his position, he has not shown manifest injustice is at stake); Robinson v. Wis Filtration Corp., LLC, 599 F.3d 403, 407-08 (4th Cir. 2010)(declining to reconsider its judgment to prevent manifest injustice allegedly created by computer problems which prevented counsel from opposing a motion for summary judgment).  Third, there has been no sea change in applicable Tenth Circuit or Supreme Court law.  See Jaramillo v. Gov't Emp. Ins. Co., 573 F. App'x 773, 749 (10th Cir. 2014)(explaining that demonstrating an intervening change in controlling law requires "extraordinary circumstances").  Accordingly, the Court concludes that relief is unavailable to Companion Life on these bases.

       **IT IS ORDERED** that Defendant Companion Life Insurance Company's Motion to Alter or Amend Judgment, filed September 4, 2020 (Doc. 31), is denied.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James Rawley
James Rawley Law Office
Albuquerque, New Mexico

      *Attorney for the Plaintiff*

Joshua Bachrach
Scott D. Sweeney
Wilson Elser Moskowitz Edelman & Dicker, LLP
Denver, Colorado

      *Attorneys for the Defendant*